Madden, Judge,
delivered the opinion of the court:
The plaintiff corporation made a contract with the Government to clear lands on certain forks of the Black Warrior River in Alabama, which lands were to be covered with water upon the completion of Dam 11, on the river. The invitation for bids included a copy of the proposed contract, a copy of the specifications, and a map. Paragraph 1-03 of the specifications was as follows:
Maps; — -The extent of the area to be cleared is shown on map marked “Black Warrior, Warrior, and Tombig-bee Rivers, Alabama, Crest Gates Dam No. 11 Proposed Bank Clearing,” which forms a part of these specifications, and is filed in the United States Engineer Office at Mobile, Ala., and the United States Engineer Sub-Office at Tuscaloosa, Alabama.
The map so mentioned was a reproduction of a general index map which had been prepared by the War Department Engineer’s Office for that area in 1909, which showed the township and range lines, the important streams, the railroad, ferries, and towns of the vicinity. It had, when it was issued to bidders, marks on it dividing the clearing work into eleven sections, since the invitation asked for separate bids upon each section, as well as for bids for the entire project. The bids requested were not for lump sum prices for the whole job or for each section, but for the price per acre at which the bidder would do the job.
The map also had placed on it, be'foré it was reproduced to be sent out to prospective bidders, an area of shading, made by small black dots, running in uniform width of about one- *85 eighth of an inch along each side of those parts of the stream’s which were shown on the map, as parts in which the water level was to be raised by the impounding of the waiters at Dam 17.
Paragraph 1-04 of the specifications, quoted in finding 3, stated the “total estimated area necessary to be cleared” in acres by sections and for the whole project. The figure given for the whole project was 3,102 acres. It then stated that “the quantities represent the approximate volume of the work to be done and will be used as a basis for the comparison of bids.”
The plaintiff, after an inspection of the site of the work by its president, T. J. Clarke, bid $51.85 per acre for the entire project. When the bids were opened, the plaintiff learned that its bid was much below that of the next lowest bidder, which was $85.00, and still farther below the Government’s estimate of the fair price of the work, which was $98.50. The plaintiff’s president therefore had a conference with Col. Park, the District Engineer who was the contracting officer, with regard to whether the bid had been affected by any misapprehension as to the work required. The plaintiff’s president inquired as to how meticulous a job of raking up twigs, etc. would be required, and on being assured that nothing unreasonable would be required, he said that if the specifications were correct the bid could stand as made.
When the work was under way, the plaintiff complained orally to representatives of the Government that a good deal of the land to be cleared lay along or in creeks, gullies, and sloughs extending back considerable distances from the streams shown on the map; that these areas were relatively inaccessible and heavily wooded and therefore the price per acre which the plaintiff had bid for the whole project was not sufficient, and an addition to that price should be made for as many acres as lay outside the area which, the plaintiff claims, the map showed.
The basis of the plaintiff’s claim, then, is that it was misled by the map which the Government furnished to bidders, because the map led it to believe that all the clearing to be done was in a narrow strip along the banks of the streams shown on the map, the strip being indicated by the shading *86 on the map; that in arriving at the price which it bid per acre it did not take into account the clearing along small tributaries, gullies, and sloughs, which clearing turned out to be more difficult and expensive than the average clearing in the strip close to the main streams. The Government answers (1) that the plaintiff was not misled and (2) that if it was misled, it was not reasonably misled, since the map, together with the accompanying papers, could not reasonably be interpreted as the plaintiff claims it interpreted them.
We have already described the map and quoted paragraph 1-03 of the specifications, which referred to the map. Paragraph 1-02 of the specifications said:
Work to he done.— * * *
(b) The work to be done consists of furnishing all labor, material, tools, machinery, and appliances, and performing all work necessary to clear and burn or otherwise dispose of, but not place in river or creek, all trees, logs, and brush or other undergrowth on lands lying between the present low-water line, contour elevation 244 feet, above mean low Gulf, and contour elevation 260 feet, along the sections of the river and its tributary streams as follows:
Section No. 1: Locust Fork from its junction with the Mulberry Fork at Mile 408 to Atwood’s Ferry, Mile 421.5, including all tributary streams. $ $ $ $ $
A similar statement ending with the words “including all tributary streams” followed for each of the eleven sections.
As shown in finding 5, paragraph 11 of the invitation for bids provided that bidders should visit the site of the work and acquaint themselves with all available information concerning the nature of the materials in the areas to be cleared, and should form their own opinions as to the amount and difficulty of the work and the local conditions bearing on transportation access and disposal. It said that failure to acquaint himself with all available information concerning these conditions would not relieve the successful bidder of assuming all responsibility for estimating the difficulties and costs of successfully completing the work.
The plaintiff’s reply, as to these provisions of the invitation for bids and the contract, is that the shading on the *87 map was a specific representation of the area in which the work was to be done, and that it relied on it as such. The plaintiff points to the language of paragraph 1-03 of the specifications, which we have quoted, which says “The extent of the area to be cleared is shown on map * * *” and says that that language, together with the map, is the direct statement on which it relied.
If, after reading this language, and opening the map, the reader had found a contour map showing the line of elevation 260 ft. in the neighborhood of the streams, but at greatly varying distances from the streams, as a contour map would necessarily show, then the plaintiff’s alleged reading of the words quoted above would be understandable. But when, as in this case, the map, when opened, showed no elevations whatever, but only a shaded area of uniform narrow width along large streams, then the quoted language did not and could not mean what the plaintiff claims, for it would be a contradiction of the simplest facts of nature. What all bidders, including the plaintiff, knew was that the purpose of the proposed contract was to remove the natural growth in the area which would be covered when the water was impounded at a dam downstream. They knew that over many miles of the courses of streams there would be great variations in the elevations of banks and adjacent land. They knew that creeks flow into streams at many places along their courses, and that few if any of them tumble down sixteen-foot waterfalls, or over rapids aggregating that height, so that their beds a short distance back from the streams into which they flow are sixteen feet higher than the levels of those streams. They knew that gullies and marshy areas are found adjacent to larger streams and their tributaries. They knew that the one who got the contract for this clearing was to do it all, not only the part of it which happened to lie close to the main streams, leaving a large additional job of clearing to be done by someone else.
The plaintiff does not, apparently, claim that it understood that it was to clear everything which lay within the shaded area, even though it was above elevation 260, as some of it might well have been. It apparently contends that the word “extent” upon which it claims it relied, meant that nothing *88 outside the shaded area was within the contract, though not everything within the shaded area was within the contract. Though the plaintiff has computed the acreage of all the clearing it did outside the shaded area, it does not tell us how wide the shaded area was. It is, on the map, so vague in its outline that it would be difficult to apply to it the scale given on the map, with accuracy.
The plaintiff’s president, who was a civil engineer and a contractor of thirty years’ experience, who had built levees under contracts with the Government and had done the necessary clearing incident thereto, went over some sixty miles of the courses of these streams in a motor boat, before he prepared the plaintiff’s bid. He also went to other parts of the area in an automobile. He says that the gullies and creeks leading into the streams that he toured were filled with bushes and overhanging vines, so that he could not see how far they extended. That, of course, would be no reason why he should assume that what lay behind the screen of vegetation was a state of affairs which in fact never existed anywhere. He must have guessed what the condition was which he could not see, and he may have underestimated the cost of clearing such areas. But he was specifically notified by the contract papers, as he must have known without such notice, that he must take the responsibility for the correctness of his estimate.
We have not made a finding as to what was in the mind of the plaintiff’s president when he made the plaintiff’s bid. What he claims was in his mind is so contrary to any reasonable interpretation of the contract documents that it could not determine the meaning of the contract. It is therefore irrelevant to the issue of the interpretation of the contract.
The plaintiff claims that Article 15 of the contract, which is quoted in finding 8, is applicable. That article lodges with the contracting officer the power to decide all disputes concerning questions of fact arising under the contract, subject to written appeal by the contractor to the head of the department or his representative. After the plaintiff had made its claim in definite form, Colonel Park, the District Engineer who was the contracting officer, addressed a report to the Chief of Engineers, through the Division Engineer of *89 the Gulf of Mexico Division, about the claim. That report appears in finding 14. It does not purport to be a decision under Article 15, since it is not addressed to the contractor, but to the Chief of Engineers, and concludes with a recommendation rather than a decision. If the contracting officer was passing the question on to higher authority, with a recommendation, and not deciding it, the contractor would not have been bound by his recommendation, if it had been adverse to the contractor, and the Government would likewise not have been bound by it, it being adverse to the Government. We think that the contracting officer was only passing the question on to higher authority, a not uncommon practice in such cases.
In our finding 14 we have quoted a letter written by Col. Park, the District Engineer, to the plaintiff. The proof does not show that this letter was mailed to or received by the plaintiff. The letter is included in the findings for the purpose of showing that Col. Park, the contracting officer, knew exactly how to make a decision under Article 15 of the contract, when in fact he intended to make a decision, and not a mere recommendation to higher authority. In that letter, after the discussion of the facts of the claim here in suit he concluded with the following paragraph:
The decision of this office is that requiring you to clear lands outside of the shaded portion shown on the map furnished with invitation for Bids was within the requirements of the contract and for this reason your Claim No. 1 is disapproved.
A similar formal decision was written at the end of the discussion of each of two other claims made to the contracting officer by the plaintiff, and a final paragraph was appended summarizing the three decisions.
The later writing of July 20, 1938, made by Col. Park, the contracting officer, and which the plaintiff claims to be a decision in its favor under Article 15 of the contract, also appears in finding 14. It was not written in the form of a decision, but of a recommendation. It was not addressed to, or communicated to the plaintiff, as a decision under Article 15 would naturally have been. The action recommended did not, as to claim 1, follow naturally from the facts stated. *90 except upon the assumption that the action was to be taken by some higher authority which could, in disregard of the contract, take into consideration the facts that the plaintiff had bid too low, had done a good job, and had lost money in doing it, and therefore give the plaintiff some additional compensation. We think the District Engineer recognized that he had no power to make a decision on such a basis, and therefore passed the question, with a recommendation, to the General Accounting Office, where, he apparently thought, such a decision could be made, if it could be made anywhere.
We see no reason for twisting the District Engineer’s recommendation into a decision by him as contracting officer under Article 15. We would not do so against a contractor if the decision were adverse to him. Neither the contractor nor the Government has such a vested right in an erroneous decision by a non-judicial person, that it can claim that every utterance by him in its favor is a decision under Article 15. To have one’s case decided on its merits by a judicial tribunal is not an intolerable fate, that ought to be avoided by strained construction.
If we assume, contrary to what we have said, that the contracting officer intended to make a decision under Article 15, we encounter a serious question as to whether he had the power to bind the pai’ties by such a decision as his letter made. We suppose that decisions under Article 15, like those of arbitrators, administrative officers or boards, and quasi-judicial agencies, must take some shape in which the decision logically flows, according to applicable law, from the facts found. The applicable law in this case is the law of contracts. The only factual basis which occurs to us for the award of money to the plaintiff on its claim would have been that the plaintiff was reasonably misled, to its damage, by representations made by the Government. The contracting officer, in his narrative preceding his recommendation, did not even find that the plaintiff was misled. He said “* * * and it appears entirely logical for the contractor to claim a higher cost per acre for any clearing work performed by him in such areas, if, as he contends, he was misled by the information contained in the map * * * .” We think it is not proper to imply, from this expressly conditional lan *91 guage, that the contracting officer was, awkwardly, saying tliat the plaintiff had been misled. The letter certainly does not say that the plaintiff had been misled, and there is little, if anything, in it from which to imply that the contracting officer thought it had been misled. But again assuming that we should imply a finding that the plaintiff had been misled, still no right under the contract would follow unless the plaintiff’s being misled by the contract papers was reasonable.
The contracting officer’s letter comes nowhere near to such a finding. If he had made it, it would have been without any rational basis. For us to imply that he found it, when in our opinion such a finding would have been wholly without support, would show that we were willing to impute to him, from his silence, a finding that we would under no circumstances father as our own.
It may well be that the contracting officer was not aware of the requirement that one must have been reasonably misled by an innocent misrepresentation in order to have a right to compensation for resulting loss. It is a doctrine that one learns from law books, not from engineering treatises or practice. But whether his omission to find this essential fact was intentional, or due to ignorance of its necessity, a decision for the plaintiff could not, under the law of contracts, have been made without it. If, without it, such a decision were made by a jury, or a trial judge, or an administrative or quasi-judicial tribunal, it would be promptly set aside by a reviewing court. If, under Article 15, a contracting officer has the power to give away the Government’s money when, under the facts and the law, the Government owes nothing, or to destroy a claim of a contractor, valid under the facts and the law, he has a unique power indeed. It is perhaps conceivable that a contractor, a private person, could validly agree to lodge such a power in the contracting officer. But -we think it would be clearly illegal for a department of the Government to subject the public funds to such a power.
We are asked to twist language of recommendation to superior officers into language of decision made upon the contracting officer’s own responsibility; to fill in gaps in findings of facts by imputing to the contracting officer things which he did not say; all to what end ? To prevent ourselves from *92 deciding this case upon its merits. We think the result is hardly worthy of the effort which would have to be made to reach it.
Our decision on the merits is that the plaintiff, if it read the contract papers as it claims it did, did so unreasonably, and that the contract which the parties made was that the plaintiff would, for the bid price per acre, clear all land lying between elevations 244 and 266.
. The plaintiff’s petition will be dismissed. It is so ordered.
Whitaker, Judge; and Whaley, Chief Justice, concur.