**JOHN ARBORIO, Inc. v. UNITED STATES.**

**No. 46868.**

Court of Claims.
March 1, 1948.

MADDEN, J., and JONES, C. J., dissenting in part.

———— · ————

Samuel E. Aronowitz, of Albany, N. Y., (Martin Schenck and O'Connell & Aronowitz, all of Albany N. Y., on the brief), for plaintiff.

Currell Vance, of Washington, D. C., and Peyton Ford, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and HOWELL, WHITAKER, LITTLETON and MADDEN, Judges.

HOWELL, Judge.

Plaintiff brings this suit to recover for alleged underpayment on two items of work involved in its performance of a contract for the construction of Stewart Field Auxiliary Airport, site No. 1, Montgomery, Orange County, New York. It is sought to recover the difference between the ditching price of $1.20 per cubic yard and the borrow or common excavation price of 45 cents or 35 cents per cubic yard for some 70,605 cubic yards of material falling between the ditch lines of the east ditch projected from final field grade upward to original field grade.

Plaintiff also sues to recover the difference between $3.40 per cubic yard and $1.50 per cubic yard for some 85,827 cubic yards of ledge rock removed from the contract by Change Order No. 1 and Supplemental Agreement No. 1, and later restored in the contract by Supplemental Agreement No. 2 at a price of $1.50 per cubic yard.

There are, therefore, two principal questions involved—the first in connection with the ditch excavation which can be stated as follows: Should the disputed yardage be paid for as borrow or common excavation under a reasonable interpretation of the contract provisions, specifications and revised drawings made in the light of the manner in which the work was performed. The second is in connection with the rock excavation and involves the question as to whether Supplemental Agreement No. 2 or any other agreement of the contract was entered into by the plaintiff under duress and whether the price of $1.50 per cubic yard agreed upon in Supplemental Agreement No. 2 was correctly applied by the contracting officer to the total yardage of 85,827 cubic yards of ledge rock excavated.

The ditch excavation yardage in controversy was in connection with the east ditch. This ditch was not dug at the location shown on the original contract drawings but was redesigned to parallel the road running east of the airport after the intervening ground had been acquired. This intervening ground became a source of borrow material for raising lower parts of the airport.

Payment for the so-called north ditch and for the French drain was made from original grade to the invert of the ditches. Since the north ditch, when dug, was outside of the field and the French drain, when dug, was in an area to be later raised, there was no other possible method of payment and such action constituted no precedent for payment on the east ditch which was later designed in an area to be reduced in grade and not shown on any drawings exhibited in this case.

Proof does not show whether the east ditch was dug before or after the lowering of the grade in that area. It does show, however, that the contracting officer did not consider it necessary to construct this ditch prior to grading, nor direct the contractor so to do. If the east ditch was constructed in advance of the grading, it was done by plaintiff's choice. Moreover, the portion of the ditch above finished grade was of no benefit to the Government and served merely the purpose of temporary drainage during construction.

Specification 3-03c is as follows: "Excavation, New Drainage Ditches shall be

measured by the cubic yard in place from surveys made before and after excavation for the ditches. The contract price per cubic yard for ditch excavation shall cover the cost of the materials, labor and equipment and doing all work necessary to excavate the new ditches, including the proper disposal of all materials as specified or directed by the Contracting Officer."

Specification 5-02a provided as follows: "General.—Embankment may be placed on frozen ground, if approved by the Contracting Officer. During, or after, thaws, there shall be additional rolling so that a compact layer is formed in the embankment. Prior to placing embankments, the Contractor shall excavate and maintain during his filling operation such temporary ditches and drains as are necessary to maintain the embankment and contiguous areas in a reasonably dry condition. No special payment for such work will be made. If desired by the Contractor, he may at his option construct the ditches required under Item 3 of the specifications, to serve the above purpose. In this event, however, payment will be made only after completion of the embankments and after ditches are cleaned and graded in accordance with provisions of Section III of these specifications."

In view of these provisions and the manner in which the work was performed, a decision was necessary regarding proper payment for the yardage between the ditch lines of the east ditch above finished grade. The authority as well as the responsibility for making such decision are found in Specification 1-35 as follows: "Interpretation of specifications.—The Contracting Officer shall decide all questions which may arise as to the performance, quantity, quality, acceptability fitness, and rate of progress of the several kinds of work to be done or materials to be furnished under this contract. He shall decide all questions which may arise as to the interpretation of the specifications and of drawings used and as to the fulfillment of this contract on the part of the contractor, and as to defects in the contractor's work."

It was the duty of the contracting officer to approve payments to the plaintiff based upon estimates made and approved by him.

Article 16(a) of the contract is as follows: "Article 16. Payments to contractors.—(a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the contracting officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration."

Therefore, in order to make the first partial payment for work already performed, it became necessary for the contracting officer to exercise the discretion conferred upon him by these sections and decide how the excavation for ditches and trenches should be measured. Accordingly, on July 17, 1942, Colonel Charles D. Reidpath, who was the contracting officer from June 17, to October 30, 1942, made his decision and issued instructions relative to the measurement of the excavation for ditches and trenches, being Item 4 of the contract, as follows: "Excavation—at price of $1.20 per cubic yard—will be considered as the volume below finished grade of field where ditch occurs. All excavation above that line will be paid for at unit price of common excavation."

Colonel Reidpath was the first contracting officer and was present not only when the work was begun but most of the time when the work was actually being performed. His view as to the classification of ditch yardage from the east ditch was based upon his on-the-job personal observations as well as his interpretation of the contract specifications and revised drawings made in the light of the manner in which the work was performed. That this decision was a fair and reasonable interpretation is substantiated by the fact that it was later concurred in by Major R. L. Donnelly, a succeeding contracting officer, by the Board of Contract Appeals, War Department, by the authorized representative of the Secretary of War, as well as by the Commissioner of this Court.

On March 10, 1943, Colonel Drew Eberson became contracting officer and by that time substantially all of the contract work had been completed, but there were several items as to payment then in dispute. On

May 22, 1943, Colonel Eberson held a conference with plaintiff's representatives in relation to the items in dispute, one of which was the proper measurement of ditch and trench excavation.

Upon an examination of the original drawings without examining the revised drawings, Colonel Eberson decided that volume of ditch excavation was "the volume contained between the intersections of the side slopes with the original ground elevation." This decision was recorded in a letter to the Area Engineer under date of May 25, 1943, by an engineer of the office, but the letter was not signed by Colonel Eberson or at his direction.

As a result of this decision by Colonel Eberson, the estimated number of cubic yards of ditch and trench excavation was increased from 78,000 to 136,984 cubic yards, and payment of that estimate was made in July 1943. The amounts of Item 4, for which payments had been previously made were merely estimates and not based on actual measurements. The volume contained in the voucher upon which the July payment was made was based on actual measurement which, in accordance with the decision of Colonel Eberson, included all of the material between the invert of the ditch and the intersection of the sides of the ditch with the original surface of the ground, without regard to whether the elevation of the original surface had been changed upward or downward before the ditch was excavated.

Shortly thereafter, on August 22, 1943, Major R. L. Donnelly, who, as Assistant Area Engineer, had had supervision of this contract work, became contracting officer. Previous to the preparation of the next payment voucher, the question of the volume of ditch excavation was again brought to the attention of the defendant's officers. Major Donnelly then decided that the volume should be measured from the invert of the ditch to the intersection of the sides with the surface, either original or graded, whichever existed at the time the ditch was excavated. Naturally this caused a considerable reduction in the quantity of the excavation, particularly in connection with the east ditch. On November 3, 1943, Major Donnelly certified the revised esti-

mate for payment and on November 18, 1943, by letter, advised plaintiff of his decision made pursuant to Section 1-35 of the specifications which was the first written interpretation addressed and delivered to the plaintiff. In his letter Major Donnelly also advised plaintiff of its right of appeal under Article 15 of the contract and on November 27, 1943, plaintiff appealed the decision to the Secretary of War. The appeal was referred to the Board of Contract Appeals of the War Department, which Board held that the decision was correct, and so reported to the authorized representative of the Secretary of War, who, on behalf of the Secretary of War, on May 31, 1945, sustained the decision and denied the appeal.

The plaintiff insists Colonel Eberson's action making payment to the plaintiff for the disputed yardage was final and that such action could not later be reversed by a succeeding contracting officer. However, it must be borne in mind that Colonel Eberson's action reversed a former decision of Colonel Reidpath. The evidence as found by the commissioner discloses that neither the decision of Colonel Reidpath nor of Colonel Eberson was actually communicated to the plaintiff in writing and therefore the written finding of Major Donnelly was the first definite contract step taken with regard to this controversy. Clarke Brothers Construction Co. v. United States, 103 Ct.Cl. 57, 89; S. C. Sachs v. United States, 63 F.Supp. 59, 104 Ct.Cl. 372, 395. The matter did not involve the performance of the work by the contractor but was simply a decision as to the proper method of payment, and any succeeding contracting officer or the same contracting officer was authorized, up until the time of final settlement, to rectify any erroneous payments theretofore made. It is conceded that after one contracting officer has directed the contractor to perform work in a certain manner, a succeeding contracting officer cannot reverse such decision to the contractor's financial detriment (Arthur W. Langevin v. United States, 100 Ct.Cl. 15, 40, 41), but here no question of the performance of the work was involved as it had already been performed when Colonel Eberson's decision was made and the con-

117

tractor's further operations were in no way affected thereby. When Major Donnelly became the contracting officer, the question was simply whether proper payment had been made and the action represents an effort to rectify any mistakes made in this regard to final settlement.

■ We are of the opinion that the decision of the contracting officer as to the amount due under a contract is not final. The Penker Construction Co. v. United States, 96 Ct.Cl. 1. Here we have a succession of contracting officers and different interpretations of the contract and specification provisions involved. It therefore devolves upon the Court to decide whether one or the other interpretation is correct or to decide that neither is correct and adopt an interpretation of its own entirely different from the other two. However, it does appear that upon a consideration of the facts as well as the provisions of the contract and specifications that a proper recovery should be based upon that volume of ditch excavation measured from the invert of the ditch to the intersection of the sides of the surface, either original or graded, whichever existed at the time the ditch was excavated. This is the view originally taken by Colonel Reidpath and later concurred in by Major R. L. Donnelly, by the Board of Contract Appeals, by the authorized representative of the head of the department, as well as by the Commissioner of this Court. It logically follows that plaintiff's claim for alleged underpayment on this item of work is without foundation.

We consider now plaintiff's claim on the item of rock excavation. A comparison of the dates of Change Order No. 1, Supplemental Agreement No. 1 and Supplemental Agreement No. 2, on the one hand, with the dates of progress payments on the other, reveals that no payment was ever withheld or deferred in order to coerce plaintiff's acquiescence in such agreements. It also appears that the discovery of the tremendous quantity of ledge rock in the southeastern portion of the site made it extremely problematical whether the defendant could continue with the project or would have to abandon it under the reserved powers of the contract. The first step taken was to so raise the elevation of the field as to eliminate the necessity of the removal of the rock.

Change order No. 1, appended to Exhibit No. 3, was dated August 18, 1942, and contained in part, the following statement: "It is determined that in view of field conditions at the site, encountered during the prosecution of the work, which necessitated changes in grades and construction and consequent revision of contract plans, it is necessary and in the best interest of the United States to modify said contract in certain particulars as follows".

Article 1 of said contract is hereby amended by adding the following: "Omit excavation, to the designated grade, of rock material encountered in the major portion of the southeasterly section of the contract area in quantity in excess of that contemplated or specified in the contract specifications, and, in lieu thereof furnish by excavating from other areas, not previously specified for excavation, approximately 350,000 cubic yards of approved earth material and place same as embankment to designated lines and grades as shown on revised plan No. SA-281."

■ Article No. 23 of the contract provided that the contract might be terminated in whole or in part in which event certain adjustments were to be made including payment to the contractor for the work done, plus a proportionate part of its profit. Rather than exercise such reserved rights, resort was had to raising the grade to eliminate the necessity of excavating the ledge rock. This solution appeared satisfactory to the contractor and not only was there no protest or appeal from the change order, but such change order was accepted in writing by the plaintiff. Under the decisions of this court and of the Supreme Court, the ledge rock in question and upon became effectively removed from the purview of the contract. A. D. Irvin & A. O. Leighton v. United States, 114 Ct. Cl. 84; Arnold M. Diamond v. United States, 98 Ct.Cl. 493; United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.E 1039; United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.I 1192.

118

A few days later, on August 20, 1942, Supplemental Agreement No. 1 was executed by the parties. This agreement further confirmed, if such was necessary, the concurrence of the parties in the removal of the ledge rock from the contract. This agreement contained, in part, the following recital: "(a) During the progress of excavation at the southeasterly portion of the contract area, the contractor encountered subsurface rock approximately 144,000 cubic yards in excess of the contract estimate thereof, the cost of excavation of which would exceed the then available funds. It was also discovered that the contour drawings did not reflect true elevations of the ground surface. Due to the foregoing, it was found necessary to omit excavation of the area underlayed with the said rock and to change the originally specified grade of the contract area and to make other attendant changes".

Thereafter, on October 31, 1942, Supplemental Agreement No. 2 was executed, restoring some of the ledge rock to the contract at a negotiated price of $1.50 per cubic yard. During the course of the work and up until November 30, 1943, not one single word was uttered by the plaintiffs suggesting that Supplemental Agreement No. 2 had not been entered into by it freely and voluntarily.

In addition to Change Order No. 1 and Supplemental Agreements Nos. 1 and 2 referred to above, a change order designated as Change Order No. 3 was issued May 19, 1943, and accepted by the plaintiff, and this change order contained the following: "It is further understood and agreed that all other terms and conditions of the said contract as modified by Change Orders Nos. 1, 2 and 3 and Supplemental Agreements Nos. 1, 2 and 3 shall be and remain the same."

Also, Change Order No. 7, issued August 7, 1943, which was accepted by the plaintiff, contained the following: "It is further understood and agreed that all other terms and conditions of said contract as it heretofore may have been modified shall be and remain the same."

During all this intervening time, payments had been made to plaintiff and accepted by it without question on the basis of the price fixed in Supplemental Agreement No. 2. In the spring of 1943, when Colonel Eberson had come to the site for the avowed purpose of hearing the complaints by the plaintiff, full conference was had with plaintiff's officials and not even here was there any suggestion of a claim in connection with the ledge rock excavation or duress in connection with the execution of Supplemental Agreement No. 2.

The Contract Appeal Board declined to consider plaintiff's claim on this matter because there had been no previous finding by a contracting officer on which to appeal. Thereupon the plaintiff requested Major Donnelly to find on this claim and on August 23, 1945, he ruled that there was no basis for additional payment to plaintiff because payment had been made in accordance with Supplemental Agreement No. 2. Plaintiff's appeal from such finding to the head of the Department was not prosecuted within thirty days as prescribed by the contract and was denied.

Plaintiff also claims that at any rate it should receive $3.40 per cubic yard for the ledge rock removed during October 1942, prior to the date of Supplemental Agreement No. 2. This claim was not even asserted at the late date of plaintiff's appeal to the head of the department of November 30, 1943, in which the claim of duress was first made. The claim was not mentioned in plaintiff's petition and was not developed until the presentation of testimony before the commissioner.

■■ When a supplemental agreement has been signed by both parties it becomes a part of the contract and specifications and its interpretation as to matters of fact is a matter for the contracting officer in like manner as other parts of the specifications. As previously pointed out, payments were made for the ledge rock in controversy at the price of $1.50 per cubic yard without complaint or protest from the plaintiff at any time. Such payment was the contracting officer's interpretation that the price applied to the yardage excavated in October 1942, and it necessarily applied, since until the execution of Supplemental Agreement No. 2, such yardage was en--

tirely outside of the contract. Major Donnelly's letter previously referred to constituted a written interpretation. This certainly represented the plaintiff's last opportunity to question the propriety of the contracting officer's application of the price to the yardage excavated in October 1942. Not only was the appeal therefrom too late but it still failed to question such interpretation.

We think the plaintiff's silence and inaction constitute not only clear proof negativing duress, but are a fatal failure to follow prescribed contract procedures in its claim for payment of the area excavated in October 1942.

Plaintiff's petition will therefore be dismissed. It is so ordered.

WHITAKER and LITTLETON, JJ., concur.

MADDEN, Judge (dissenting in part).

I am unable to agree with that part of the decision of the court which relates to the method of computing yardage for ditch excavation. The Government wrote the specifications and prepared the drawings, and these papers were, as to the point in question, unclear. Specification 1—35 provides, in part, as follows: "The Contracting Officer * * * shall decide all questions which may arise as to the interpretation of the specifications and of drawings used * * *."

Colonel Reidpath was the contracting officer when the work in question was done. He interpreted the unclear documents as meaning that the contractor should be paid, for the ditch here in question, only for the cavity below the level of the finished grade. He issued instructions accordingly, which instructions the plaintiff protested. No reply was made to the protests, but the Government did not regard the question as settled, because many months later it designated a new contracting officer, Colonel Eberson, and instructed him to determine this and several other matters in dispute. On May 22, 1943 Colonel Eberson conferred with the plaintiff's representatives. He examined the original drawings, the only ones which had been available to the plaintiff at the time the contract was made. On the basis of the documents, he made his decision as to their interpretation. He told the plaintiff what the decision was, and caused it to be recorded by a subordinate and transmitted to the Area Engineer. The decision required that the yardage for the excavation of the ditch excavation be recomputed and a large additional payment be made to the plaintiff. The recomputation and payment were promptly made.

Some months later, still another person, Major Donnelly, became contracting officer. He reopened the question, reversed Colonel Eberson's interpretation, and caused the payments already made on the basis of that interpretation to be deducted from other money admittedly due the plaintiff.

I think the new contracting officer and the Government had no power to reopen the question decided by Colonel Eberson. The part of the specifications which I have quoted makes the contracting officer the arbitrator of such questions of interpretation. When a contractor lodges with the agent of the other contracting party, the Government, such a power of arbitration, it is a most unusual gesture of confidence in the fairness and intelligence of the agent of the party whose interests are adverse to his. By section 1—36 of the specifications the contractor is given the right to appeal to the Secretary of War from an adverse decision of the contracting officer. But the Government, in the contract, reserves no right to appeal from the decision of its own officer. I think, therefore, that the decision of Colonel Eberson as contracting officer was final, and that all that occurred later was irrelevant. When the contractor confides to the Government's agent the power to arbitrate questions of interpretation, he intends to lodge that power in some person who shall, by Government designation, occupy the position of contracting officer at the relevant time. He does not intend to lodge it in a changing succession of persons whose different minds would, naturally, react differently to a close question, and thus leave it undecided until the contract was finally terminated by settlement and release.

It is suggested that Colonel Eberson's decision was no more final than the opposite decision of his predecessor, Colonel Reid-

path. The plaintiff protested Colonel Reidpath's decision. Under paragraph 1—36 of the specifications, it thereupon became the duty of Colonel Reidpath promptly to investigate the protest, and furnish the plaintiff his decision in writing from which the plaintiff had the right to appeal. He did not do these things. Instead, as I have said, the Government kept the matter open and directed the new contracting officer, Colonel Eberson, to decide it. He did decide it in the plaintiff's favor. His decision was acted upon by the Government in the most substantial way, by paying a large sum of money. The Government had no right, under the contract, to appeal from it, and the plaintiff did not waive its right to insist on that decision.

It is suggested that Colonel Eberson's failure to communicate his decision in writing to the plaintiff may be of some significance. I find nothing in the contract to support that suggestion. Indeed, Section 1—36 of the specifications negatives it. That section makes it the duty of the contracting officer to furnish his decision in writing to the contractor only if the contractor has, in writing, protested an adverse decision. Here the plaintiff was satisfied with Colonel Eberson's. decision and of course did not protest it.

It is said that the decision of Major Donnelly, the third contracting officer, adverse to the plaintiff, has been concurred in by Colonel Reidpath, the first contracting officer, the Board of Contract Appeals, and the Commissioner of this Court. I find nothing in the decision of the Board of Contract Appeals to indicate that they agreed with the decision of Major Donnelly any more than they would have agreed with that of Colonel Eberson, if that had been their problem. What the Board said of the Donnelly decision was "As he was the only contracting officer who actually made a written decision as contemplated by the contract and furnished a copy of it to appellant, his action should be considered as the final ruling on the protest as contemplated by the Claims, Protests and Appeals clause of the specifications". The Board said nothing about the merits of the questioned interpretation. I suppose it may be inferred from their rejection of the plaintiff's appeal that they did not disagree with Major Donnelly's ruling. Our Commissioner's finding was identical with our finding 11, wherein it is said that Major Donnelly's interpretation was a reasonable one.

I readily agree with this finding. But I think that my agreement with it is as irrelevant as the agreement of this Court, this Court's Commissioner, and the Board of Contract Appeals. My position is that Major Donnelly had no jurisdiction to make it. The contract made Colonel Eberson the arbitrator, not Major Donnelly or any of the other persons who agree with him. And no one has even intimated that there was any such inherent vice in Colonel Eberson's decision that it was a nullity, in spite of the agreement of the parties, expressed in the specifications, that it should be final.

I have discussed the case on the basis on which it was presented to us. The plaintiff claims that the decision of Colonel Eberson as contracting officer was final. The Government urges that the decision of Major Donnelly as contracting officer was final. As I understand the court's decision, it is that neither decision was final and that it agrees with the Donnelly decision only because it thinks it was right. I think that the difficult question of whether or not the contract made the contracting officer's decision as to the point in question final ought not to be injected into the case by the court, without any assistance from the parties in their briefs and arguments. I would decide the case on the basis on which it was presented, and express no view on the question not raised by the parties.

I would give the plaintiff a judgment for the money which was paid it pursuant to Colonel Eberson's decision and, later, taken from it.

The CHIEF JUSTICE has authorized me to say that he agrees with my views here expressed.