JOHNSON, DRAKE & PIPER, INC.,
et al.

v.

The UNITED STATES.

No. 121–73.

United States Court of Claims.

March 17, 1976.

Carl E. Buckley, New York City, atty. of record, for plaintiff. Jarvis, Pilz, Buckley & Treacy and Eugene Schaffel, New York City, of counsel.

Ray Goddard, Civil Div., Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, Judge.

PER CURIAM:

This case comes before the court on plaintiff's request, filed June 4, 1975, for review by the court of the recommended decision, filed March 4, 1975, by Trial Judge David Schwartz, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision (with the addition of footnote No. 8 by the court), as hereinafter set forth, it hereby affirms and adopts the same, as modified, as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

### OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge: Plaintiff sues to reverse a decision of the Armed Services Board of Contract Appeals in which claims under a contract were held barred by a written release. Cross-motions for summary judgment present issues, to be decided in accordance with the standards of the Wunderlich Act (41 U.S.C. §§ 321, 322 (1970)), of the validity of the release as against a plea of duress and of the applicability of the release to the claims presented. By agreement these were the only issues below and they are the only issues to be decided here.

Plaintiff, a joint venture composed of three construction firms, Johnson, Drake & Piper, Inc., Burns & Roe Western Hemisphere Corporation and Merritt-Chapman & Scott Corporation, held a contract dated May 7, 1962 for 177 items of repair and renovation, at a cost of $1.9 million, of some 300 buildings at Thule Air Base in Greenland. Shortly before December 31, 1962, the contract completion date of all but three of the contract items, the parties negotiated a supplementary agreement which was added to the contract as Modification No. 6, containing among other things an extension of time for several of the contract items and a release of claims existing as of December 31, 1962.

The work was completed on the following March 31. Several months later, plaintiff presented to the contracting officer 29 claims for extras and changes, of which 12 were settled and incorporated into the contract by supplementary agreements (also "Modifications") and 17, making claim for $1.5 million, were denied as barred by the release. On appeal, the Armed Services Board of Contract Appeals, one member dissenting in part, held 16 of the 17 claims barred by the release. The 17th claim, held unaffected by the release, was remanded for consideration on the merits, and is not involved in the present proceeding.

The plaintiff's contentions to be discussed herein are that the release is invalid for having been obtained by duress, and that if valid, it should be construed to apply only to types of claims other than those presented and in any event not to 11 of the 16 claims in suit, which are said to have arisen in 1963, after the effective date of the release. Additional contentions, not requiring discussion, are that the release is void for illegality as an encroachment on the remedy provided by the Disputes clause and that an exception in the release should be construed as excepting all claims.

It is here held that the Board correctly decided all the issues against the plaintiff. Because the Board's decision is found to be correct in all respects, there is no need to

distinguish between the varying degrees of finality which under the Wunderlich Act, *supra,* are to be accorded the Board's decisions of issues of fact and of law.

The setting for the entire case—release and claims and contentions—is the long Arctic winter and the correspondingly short season in which construction work can be done outdoors. Progress of the work according to schedule was of special importance in the contract, for the early onset of cold weather in Greenland would prevent outside work after the third week in September. Work began in late May 1962. There is no doubt that plaintiff suffered delays of various kinds, although responsibility for the delays has not been fixed. From July to November the plaintiff complained of delays said to be the Government's fault or otherwise excusable, and the Government, in no wise agreeing, complained of plaintiff's failure to keep to schedule.

As late as October 19 plaintiff maintained that despite the delays it was on or close to schedule. On November 20, however, acknowledging that the completion date of December 31 could not be met, and giving a variety of excuses for the delay, plaintiff formally requested an extension of time to February 28, 1963 for some contract items and to August 30, 1963 for others. Upon this, the contracting officer, the division engineer of the Corps of Engineers located in New York City, paid a three-day inspection visit to the site in Greenland and there became convinced that all the excuses were invalid and that plaintiff should be terminated for default. On his return, a meeting was convened on December 10, 1963 of representatives of plaintiff and of the Corps of Engineers at which the contracting officer stated his view that a default termination was warranted and invited plaintiff to present its reasons why it should not be terminated for default. Among those present for the plaintiff were the project manager, five vice-presidents of the three participating firms and two lawyers. Present for the Government were the contracting officer, several branch chiefs and a lawyer. The alleged duress is said to have taken place at this meeting.

The meeting was opened by the contracting officer who stated his above-mentioned views, and plaintiff's representatives then stated in detail the reasons why they felt the delays were excusable and they should receive the extensions of time desired. After a general discussion, the contracting officer in a detailed statement, during which he referred to documents, rejected the reasons which had been offered by plaintiff and adhered to his decision to terminate the contract for default.

Thereupon, in the course of the discussion, the plaintiff's representatives expressed a willingness to do whatever was necessary to be allowed to complete the work and not be terminated for default. The contracting officer changed his mind because he felt that plaintiffs were "good guys" whose companies had good reputations and should not be required to suffer the harm to their reputation from a termination for default. He would give the desired extension on conditions. The conditions were that plaintiff subcontract certain of the items to another contractor; that plaintiff undertake not to bid on the work at Thule in the following year, 1963; that certain items be deleted from the contract; and, finally, that plaintiff sign a general release.

The vice-presidents and the others representing plaintiff discussed the matter among themselves and agreed that they would accept the combination of extensions and conditions. Their reason was their companies had performed 160 million dollars worth of Government contracts and they could not accept the harm to their reputation and to the future business relations with the Government which might follow from a termination for default. The parties thereupon worked out a written agreement, incorporated into the contract as Modification No. 6, effective December 31, 1962, in which extensions of time were given on four items to February 28, 1963, as requested; seven of the eight items on which plaintiff had requested extensions to

August 30, 1963 were required to be subcontracted to the contractor who would receive the award for 1963 work at the Base; and the eighth item was deleted from the contract, with an appropriate reduction made in the contract price. The Modification contained a release of claims arising before December 31, 1962,[1] and further provided that it should not be taken as a waiver of the Government's right to damages for failure to complete the work. In a separate letter, plaintiff undertook not to bid on work at the Base in the 1963 season.

## I

### The Claim of Duress

The Board rejected the claim of duress on the ground that plaintiff was composed of three "large, successful and financially secure" companies and was well represented at the crucial meeting; that the contracting officer was convinced in good faith that plaintiff was subject to default termination for inexcusable delays; that the officer initially responded unfavorably to plaintiff's request that it be allowed to finish the work and avoid the damage to its reputation from a termination for default; that the officer then relented and agreed to extensions of time in return for a *quid pro quo* which included a general release; and, finally, that the presence of duress was negatived by plaintiff's failure to claim duress for many months and even for years after the time it alleges that it was put under duress.

■ Duress, the Board held, would be shown if the contracting officer by coercive, that is, wrongful acts, generated in plaintiff such a fear of damage to its reputation from a termination for default as permitted no alternative but to agree, involuntarily, to the release. *Fruhauf Southwest Garment Co. v. United States,* 111 F.Supp. 945, 126

Ct.Cl. 51 (1953). On the application of this standard, the Board correctly concluded, plaintiff had not shown any coercive acts by the contracting officer; the fear that if it pressed its claim of right to an unconditional extension and were terminated for default, it would suffer a stigma which would disable it from obtaining Government contracts was, the Board held, not duress.

Plaintiff challenges the Board's decision on the ground that at the meeting of December 10 the contracting officer threatened the blacklisting of the constituent firms unless the release were agreed to, and that the Board erred in finding that no such threat was made. The evidence relied upon is a paragraph in the memorandum of the meeting dated December 19 and reviewed and signed by both parties. The paragraph relied upon is the preface to a recital of the several agreements reached at the meeting:

5. The Contractor was told that each joint venturer had a previous good reputation in performing Government work and that termination of this contract for default could hurt their reputation. In view of this and the Contractor's indicated willingness to do whatever is possible to complete this contract rather than be terminated for default it was agreed as follows: * * *

■ The word blacklisting is not used and there is no charge that it was actually spoken by the contracting officer. The contention is that his reference to the effect of default termination on the reputations of the joint venturers was by innuendo a threat that if terminated for default, the three firms would be blacklisted or debarred from obtaining Government business in the future.

The several accounts of the meeting in the record, written and oral, and of the surrounding details provide substantial evidence that in the context of the meeting

---

1. Modification No. 6, paragraph 8:

"8. The Contractor, for itself, its successors and assigns, does hereby release the United States of America, its officers, agents and employees, from all claims and demands whatsoever, in law or in equity, which against the United States of America, its officers, agents and employees, the Contractor, its successors and assigns now have in connection with or arising out of the performance of this contract, except as to payments earned or to be earned by the Contractor for work performed under the contract."

the contracting officer's reference to loss of reputation from a termination for default were not spoken or understood unkindly or threateningly; that rather the possible harm to the venturers' reputations was a reason the contracting officer relented from his intention to terminate and allowed plaintiff to finish the work, on terms.

■ But even if, in the course of hard bargaining, a threat of termination were bluntly made, there was no impropriety, without more. Contracting officers doubtless daily and justifiably threaten tardy contractors with a termination for default. This contracting officer had already written several letters to the plaintiff containing such threats. A repetition of the threat, at a meeting called for the very purposes of considering plaintiff's case against a termination for default, could add little to what plaintiff already knew—that a denial of an extension and a default termination might have consequences for future business.

The great value for plaintiff of the agreement reached at the meeting of December 10 was the avoidance of litigation over its excuses for delay, litigation whose outcome might have left a permanent blemish on the reputations of the constituent companies. Plaintiff's position, stated at the meeting and in earlier letters, was that its delays were Government-caused or otherwise excusable as beyond its control and thus that it was unconditionally entitled to an extension of time. The contracting officer conceded neither excusability nor Government responsibility and steadfastly maintained, from the beginning, that plaintiff had only itself to blame for all the delays.[2] When finally the two sides met to resolve their differences, the contracting officer could not be persuaded otherwise

than that plaintiff's excuses were invalid. Plaintiff, defeated in its efforts to convince the officer and faced with a default termination, asked for terms and was offered an extension of time on conditions which its representatives deliberately accepted after weighing the pros and cons. Their predominant motivation was the possibility that a termination for default would so affect their reputation as to cause a loss of future Government business. To avoid this risk they gave up what they knew was their right to appeal the decision of the contracting officer and reverse it on a showing that he was wrong. Their manifest desire to be allowed to finish the contract on almost any terms suggests that they had some doubts, at least, of the success of any legal challenge to a default termination.

■ In this situation more than one ingredient of duress was lacking. A comprehensive definition of the circumstances constituting duress is impossible; this court has pointed out that each case must be decided on its own facts. *Fruhauf Southwest Garment Co. v. United States, supra.* But some indicia of duress, positive and negative, are well known.

■ Economic pressure and "even the threat of considerable financial loss" are not duress. *International Tel. & Tel. Corp. v. United States,* 509 F.2d 541, 549, n. 11, 206 Ct.Cl. 37, 52, n. 11 (1975). "Economic duress may not be implied merely from the making of a hard bargain." *Aircraft Associates & Mfg. Co., Inc. v. United States,* 357 F.2d 373, 378, 174 Ct.Cl. 886, 896 (1966). The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions. *Fruhauf Southwest Garment Co. v. United States, supra,* 111 F.Supp. at 951, 126 Ct.Cl.

---

**2.** For instance, to the excuse for delays by reason of an inability to obtain prompt clearance of Danish labor for work in Greenland, the contracting officer's response was that plaintiff did not early enough investigate the process of obtaining clearance and for reasons of economy did not ask for Government's consent to use American labor. Another excuse was that the Government had neglected to transport materials; the Government's position

was that the supplies had not been delivered to the port of embarkation the requisite number of days before the transport berthed.

The merits of these excuses, largely coincidental with the question of the Government's liability for the claimed equitable adjustments, was not litigated, pursuant to the agreement of the parties to postpone the merits of the claims and limit the issues and the evidence to the validity of the release and its coverage.

at 62. "Some wrongful conduct must be shown, to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity." *La Crosse Garment Mfg. Co. v. United States*, 432 F.2d 1377, 1382, 193 Ct.Cl. 168, 177 (1970).

 It is not duress to threaten to make good faith use of the remedies prescribed under a contract. "A party is always entitled to say that if his offer is not accepted, he will avail himself of his legal rights; it is only the threat of a wrongful or unlawful act that may constitute duress. Such a threat will amount to duress only if it is sufficient to overpower the will of the other party and prevent the free exercise of his will." *Beatty v. United States*, 168 F.Supp. 204, 206–207, 144 Ct.Cl. 203, 206 (1958); 13 Williston on Contracts § 1607 (3rd ed. 1970). A free choice between two courses of action negatives duress.

 By these tests there was here no duress. The Government's representatives committed no wrong. No challenge is made, and no evidence would support a challenge if one were made, to the sincerity of the contracting officer's conviction that plaintiff's excuses for delay were invalid. Nor has evidence been presented showing that the officer's position was so ill-grounded as to be constructively insufficient basis for his "threat" to terminate for default. It was his duty to hold to his position, confirmed during his inspection trip to the site, that plaintiff's excuses were invalid. He was guilty of nothing, except perhaps hard bargaining in the interest of the Government.

Plaintiff's representatives were free to rest on their demand for an extension of time. Their will was not overpowered. Representing substantial companies and represented by capable construction experts and lawyers, they knew well that their alternative was to stand on their position that they were entitled to an extension of time, and accept and appeal from a termination for default. An appeal would be heard *de novo* by a board of contract appeals and their remedies would extend even further than to such a board. Their decision to give up this alternative and accept the terms offered was a free choice. The economic pressure which in their minds dictated agreement rather than litigation was pressure of their own making. Their fear of the consequences of a default termination had within it a tacit recognition that their excuses for their delays might not stand up in court, and thus that the feared loss of reputation would be deserved.

Finally, a telling indication that no duress was practiced is the long delay before plaintiff spoke out and claimed duress. The work was completed on March 31, 1963, and the claims in issue were presented on July 25, 1963. Plaintiff did not make a claim of duress, the Board held, until August of 1966, at a pretrial conference before the Board of Contract Appeals of the Corps of Engineers.

Plaintiff maintains that it raised the issue of duress in a letter of July 22, 1964, in which it wrote that it "vigorously resisted" the contracting officer's "threats" of termination. Assuming (what a reading of the letter shows is not the case) that this letter was a sufficient claim of duress, the date of the first claim of duress is thereby put back only to July of 1964, a year after the claims were first filed and a year and a half after duress was allegedly practiced in December of 1962.

Plaintiff explains its long silence by saying that an immediate outcry would have jeopardized the extension of time and that after the extension was secure, the silence continued because of plaintiff's conviction that the claims were not within the coverage of the release. The belief as to coverage (whose merits are discussed below) was not so strong, however, as to inhibit plaintiff from an early contention that the release was invalid for lack of consideration.

 Mature and intelligent officers and counsel on the plaintiff's side were present at the meeting at which duress was allegedly practiced. Their failure to raise a claim of duress soon after fear of its consequences had been removed is compelling evidence that there was no duress in fact. *Silliman*

v. United States, 101 U.S. 465, 25 L.Ed. 987 (1879); Loral Corp. v. United States, 434 F.2d 1328, 1332, 193 Ct.Cl. 473, 482 (1970); John Arborio, Inc. v. United States, 76 F.Supp. 113, 110 Ct.Cl. 432 (1948).

Plaintiff further contends that the Board erred in failing to make explicit findings on the merits of plaintiff's excuses for delay and on the number of days of extension of time to which plaintiff was entitled. Had such findings been made, plaintiff urges, it would appear, as it did in Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 187 Ct.Cl. 15 (1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970), that plaintiff was entitled to an extension of time without surrendering its claims and that therefore the release was invalid.

A short answer is that the contention is a non sequitur. It does not follow that because a claim is by hindsight seen to be even entirely meritorious, an agreement to compromise it was in any wise improper. A party who settles his claim may not avoid it by proof that his claim was just. It has long been held that a release for a lawful consideration is binding though the contractor received only what was otherwise due him. United States v. William Cramp & Sons Co., 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907); Inland Empire Builders, Inc. v. United States, 424 F.2d 1370, 1375, 191 Ct.Cl. 742, 751 (1970).

Before the Board, moreover, plaintiff failed both to demand the findings whose absence it now criticizes and to provide the evidence of such merit to its excuses and such specific periods of delay for excusable causes as would have provided a basis for such findings. In the administrative proceedings, the parties agreed to limit the issues to the validity of the release and to put in evidence only an outline of the events preceding the meeting of December 10, sufficient to give the setting for the claim of duress. Neither side sought to prove the absolute merit of the claims of excusable delay or their demerit. Findings such as plaintiff now demands were impossible.

Urban Plumbing & Heating Co., supra, it may be added, was a very different case from the instant one. There the Government had by a threat obtained from the contractor the equivalent of a release in return for an extension of time to which the contracting officer knew that plaintiff was entitled by reason of Government-caused delay. Such knowledge made the officer's conduct wrongful and the release invalid for duress. The case has no bearing here, where without any wrongdoing the parties settled their bona fide differences by exchanging a release for an extension of time.

## II

### The Alleged Limitation of the Release

If the release is not to be invalidated for duress, plaintiff contends that it should be read so as not to bar the 16 claims in issue, because in agreeing to the release the parties had in mind only four types of claims, none of those now in issue, which were the subject of plaintiff's letter of November 20, 1962 and of the discussion of the letter at the meeting of the following December 10. Because this contention is wrong in its facts, it is unnecessary to determine whether it would so revise the terms of the release as to go beyond interpretation or construction and require reformation on proof of mutual mistake.

The contention misdescribes the letter of November 20. The letter and the discussion of its contents, at the meeting, were not concerned with claims, but with delays and plaintiff's excuses for delays, offered as justification for the requested extension of time; the reasons were not characterized as claims until long afterwards. When the contracting officer finally rejected the plaintiff's reasons for delay as grounds for an extension of time, the reasons for delay were left behind and the discussion turned to the elements of what became Modification No. 6, among them the release of "all claims" now under consideration (note 1, supra). There is no evidence to support the assertion that in agreeing to

give a release of "all claims", plaintiff was thinking of less than all claims.

Indeed, there is some affirmative evidence that plaintiff may have had prominently in mind the basis of at least some of the claims presently made. One of the causes of delay mentioned in the letter of November 20 was the alleged changed condition encountered by plaintiff under the floor of the equipment maintenance building at the Base. To the extent the causes of delay were in plaintiff's mind equivalent to claims, then plaintiff did have the present claims in mind, for several of the claims now in issue are claims for costs incurred by reason of that changed condition.

Certainly no intention on the part of the plaintiff to limit the claims subject to the agreed release was communicated to the Government at the meeting of December 10. The Government requested and understood that it was to receive a general release. Accordingly, the agreed release was described as general in the summary of the agreements which appears in the parties' joint memorandum of December 19, 1962,[3] and also in the Government's private memorandum for its contract file, required under ASPR 8–602.5, 32 CFR § 8.602–5, when a defaulting contractor is not terminated for default.[4]

The release as it appears in Modification No. 6 encompasses "all claims and demands whatsoever," with an exception: "except as to payments earned or to be earned by the Contractor for work performed under the contract." Note 1, *supra.* The origins of the exception (upon which plaintiff does not rely for the contention now under consideration) confirm the generality of the underlying release.

The exception was added after December 10, at a meeting of counsel for both parties to consider a draft of Modification No. 6. Plaintiff's counsel asked for the exception, in order that the release not cut off plaintiff's right to payments for work done before December 31 and for which the authorizing papers might on December 31 still be in process of arriving from the field. An exception for such a purpose would of course have been unnecessary had the release been limited to four types of claims.

Plaintiff maintains, next, that the contracting officer construed the release in the manner now contended for, in his decision allowing, as not barred, 12 of the 26 claims originally made, and providing for their payment in Modifications Nos. 10–14 to the contract.

This contention, too, has no merit. The claims recognized in Modifications Nos. 10–14 as surviving the release were for actual extras performed at the request of the contracting officer. The right to collect for such work, never disputed, was preserved by the literal terms and the spirit of the exception to the release preserving the right to "payments earned or to be earned by the contractor for work performed under the contract."[5] The claims rejected as barred by the release—those now in issue— are claims for costs incurred by reason of delays allegedly the responsibility of the Government. These claims were disputed from the outset and they fall squarely within the claims bargained to be released.

---

3. Memorandum for record, December 19, 1962, paragraph 5f.:
"f. The Contractor hereby waives and agrees not to asert (sic) any claims under Contract No. DA–30–347–ENG–432 which arose prior to 31 December 1962. In addition the Contractor will not asert (sic) under any other contract any claim which is related to the performance of this contract."

4. Memorandum for contract file, December 27, 1962, paragraph 10:
"10. * * *. In addition, the Supplemental Agreement will include a general release from the Contractor to the government for all claims arising out of and in connection with the performance of this contract up to and prior to 31 December 1962."

5. The recognition of claims for extras in Modifications 10–14 is consistent also with plaintiff's understanding of the release, stated in a letter of December 27 enclosing the executed Modification No. 6:
"It is understood that Paragraph 8 of Modification No. 6 does not relate to any changes in scope that may be directed by the Government other than those specifically enumerated therein."

## III

### The Application of the Release to 1963 Costs

A final question is raised as to whether the release, as of December 31, 1962, of "all claims" which the contractor and its agents "now have" applies to the claims—11 of the 16 in issue—which seek reimbursement of costs incurred partly or wholly in 1963.[6] These claims, plaintiff urges, had not accrued or arisen as of December 31, 1962 and are therefore not included within the group which was released. One of the five members of the Board dissented from the majority decision rejecting this contention.[7]

So long as costs are not ascertained or ascertainable, plaintiff contends, a claim has not come into existence—has neither arisen nor accrued—and since the full bill of costs for these claims was not known until sometime in 1963, they are unaffected by the release. Plaintiff admits that the underlying facts giving rise to the claims were known to its officers at the time the facts occurred but maintains that their impact was not known and they were not realized to be claims until after December 31, 1962.

A review of the claims shows the following:

One of the 11 claims seeks the costs of heating Government-furnished buildings which the bidding documents allegedly implied were centrally heated by the Base or did not require heating. Since the costs were incurred between July 19, 1962 and March 1963, the fact that heating would be required became known to plaintiff almost immediately after it began work in mid-1962.

Another claim seeks additional costs of allegedly unanticipated unusually harsh weather which, coupled with Base regulations requiring that workmen return to quarters during a storm, caused allegedly compensable suspensions of work. Costs were incurred between November 1962 and March 1963, mostly in late December 1962 through February 1963. The suspensions thus began to be known to plaintiff in November 1962.

Two claims seek additional costs of the repair of Government-furnished equipment and the supply of spare parts which the contract allegedly represented would not be necessary. These costs were incurred both before and after December 31, 1962.

The remaining seven claims seek additional costs allegedly incurred by reason of the changed condition already mentioned— the discovery of water under the floor of the building to be used as a repair and equipment maintenance shop—and the failure of the contracting officer to recognize the changed condition. The changed condition was discovered and first reported in July 1962. In four of the seven claims, costs were incurred before and after the end of 1962 and in three costs were incurred only in 1963. What was essentially one claim for the several cost consequences of the single changed condition was divided by plaintiff into 10, one for the basic condition and nine for separate "impact" cost consequences incurred in different buildings in different time periods—three periods entirely in 1962 (the claims for costs in these periods are not pressed in this part of the

---

**6.** Of the 17 claims whose denial was appealed to the Board, one was held by the Board to be a claim for work which the Government had in January 1963 directed be done, and thus not barred by the release. A second, for increased costs associated with the employment of Danish labor, is conceded to be barred by the release, if the release is not held invalid for duress. Four are claims for costs which were incurred entirely in 1962; plaintiff does not contend that these had not arisen in 1962. The 11 remaining claims are discussed in the text.

**7.** Board member William D. McConoughey stated:

"I *concur on the* duress issue. But in construing a release given before substantial completion of the contract (see par. 8 of Mod. No. 6 effective 31 Dec. 1962), greater meaning should be attached to the word 'now'. With respect to the 17 disputed claims, costs incurred after 31 December 1962 should not be barred, and should be considered on their merits."

case), four periods before and after the end of 1962 and three periods entirely in 1963.[8]

■ Before the end of 1962, therefore, plaintiff knew all about the present claims except the total of the costs for which claim would be made. It knew not only, as has been admitted, the facts which form the basis of the 11 claims, but it must also have known that these facts would be the basis for claims, when all the costs would be known.

With this knowledge, plaintiff's representatives agreed, at the meeting of December 10, to give a general release. It would have been simplicity itself to have asked for a reservation from the release of a right to compensation for the matters now the subject of the 11 instant claims (or all 16 claims in issue) with their costs to then date and the costs yet to be incurred. It may reasonably be inferred from the record that the representatives remained silent because they understood the bargain they made as calling for an all-inclusive release which would give the Government a release of all claims.

The contracting officer had at that moment denied the extension of time sought to be justified by the alleged changed condition and a variety of other causes, which plaintiff said were, and the contracting officer said were not, the Government's responsibility. The plaintiff's representative must surely have been aware that their agreement to release "all" claims, without explicit exceptions, included not only a claim for the cost consequences of the alleged changed condition but also any other claims disputed by the Government. The post-meeting episode in which plaintiff's attorney asked for and got the addition of an exception clause for a stated limited purpose, is of course confirmation that no other reservation were a part of the bargain.

■ Plaintiff gets no help from the rule that a claim does not accrue for the purpose of the beginning of a period of limitations until the damages are ascertainable. *Terteling v. United States*, 334 F.2d 250, 254, 167 Ct.Cl. 331, 338 (1964). The issue here is not a matter of when a claim for damages not yet fully ascertained is barred by the passage of time, but whether a claimant "had" or possessed a claim, sufficiently to reserve it from a general release, at a time when all the damages had not yet been ascertained. The rule for releases is that absent special vitiating circumstances, a general release bars claims based upon events occurring prior to the date of the release. *H. L. C. & Associates Constr. Co. v. United States*, 367 F.2d 586, 590, 176 Ct.Cl. 285, 293 (1966) and cases cited. And no exception to this rule should be implied for a claim whose facts were well enough known for the maker of the release to frame a general description of it and request an explicit reservation. *Cf. Adler Construction Co. v. United States*, 423 F.2d 1362, 1364, 191 Ct.Cl. 607, 611–12 (1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971); *United States Rubber Co. v. United States*, 160 F.Supp. 492, 495–96, 142 Ct.Cl. 42, 46 (1958); *Inland Empire Builders, Inc. v. United States*, 424 F.2d 1370, 1375, 191 Ct.Cl. 742, 749–51 (1970).

Plaintiff may not be heard to say that it knew the facts underlying its present claims but not their full impact or that they would become claims. In *Adler Construction Co., supra*, a contractor was permitted, apparently without restriction, to list 13 exceptions to a general release. His additional claims, thereafter made, were held barred. His contention that he obtained sufficient information to frame the additional claim only in discovery proceedings was held not to "excuse his failure to state his exceptions covering his present claims in

---

**8.** Plaintiff urges that at least the claims in which costs were incurred entirely in 1963 were totally separate and were therefore not covered by the release. The difficulty with this position is that, as the opinion of the Armed Services Board of Contract Appeals makes clear, plaintiff itself sought recovery of these post-1962 costs on the specific theory that they were directly related to and incurred as a direct result of the changed condition discovered in July 1962. Plaintiff itself linked these 1963 costs to the 1962 events with which the release dealt. [footnote by the court]

general terms which would have sufficed the purpose of preserving his right to pursue them." *Ibid.*

In *United States Rubber Co., supra,* the court held a release which excepted "unknown claims" to bar claims based on facts available to but unappreciated by the maker of the release, saying (160 F.Supp. at 495–96, 142 Ct.Cl. at 46):

> * * * if facts were available but not properly assimilated by plaintiff at the time of the termination agreement, plaintiff's failure to comprehend their significance in terms of recoverable expense does not of itself except them from the force of the release. The test is not the state of plaintiff's knowledge, but the availability of information which, properly digested, could reasonably be expected to acquaint plaintiff with the existence of a reimbursable cost.

That all the costs in the instant case not yet incurred at the time the release was given is in the circumstances presented no excuse for the plaintiff's failure to seek to reserve the present claims from the release. Most prominent among the circumstances is that with knowledge of the facts constituting the present claims, plaintiff nevertheless expressed full agreement to giving the Government a slate clean of all claims, with an exception not including the claims presently made.

· All the challenges to the Board's decision are without merit and the complaint must be dismissed.