657 F.2d 1300
 UNITED STATES of America, Plaintiff-Appellant,
v.
BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and
Samuel Ades, individually and as partners of
Bedford Associates, and Amcar Management
Corp., Defendants-Appellees,
and
The Bowery Savings Bank, Intervenor-Appellee.
The BOWERY SAVINGS BANK, Plaintiff-Appellee,
v.
BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and
Samuel Ades, individually and as partners of
Bedford Associates, Defendants-Appellees,
and
United States of America, Defendant-Appellant.
 Nos. 267, 377, Dockets 80-6105, 80-6107.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 31, 1980.
Decided March 31, 1981.
 
 Harvey J. Wolkoff, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., S. D. N. Y., William J. Brennan, Michael H. Dolinger, Asst. U. S. Attys., New York City, on the brief), for plaintiff-appellant.
 Frank H. Wohl, New York City (Ronald Jay Litchman, Douglas J. Clubok, Rosenman Colin Freund Lewis & Cohen, New York City, on the brief), for defendants-appellees Bedford Associates et al.
 Terence F. Gilheany, New York City (Howard R. Hawkins, Jr., Terrence J. Connolly, Cadwalader, Wickersham & Taft, New York City, on the brief), for plaintiff-appellee Bowery Savings Bank.
 Before MOORE, MULLIGAN, and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 These consolidated appeals, now before us for the second time, require us to determine the rights and liabilities of three parties interested in a 21-story office building located at 120 Church Street in New York City. Bedford Associates[1] owns the building; The Bowery Savings Bank ("Bowery") holds a consolidated first mortgage on it; and the United States Internal Revenue Service ("IRS") has occupied the building as its Manhattan District Headquarters since shortly after construction in 1962. The lease under which the IRS formerly occupied the building expired on October 31, 1978. This litigation commenced in March 1979, when the government sued Bedford for specific performance of, and damages under, a new lease it contended had been concluded through negotiations between Bedford and the General Services Administration ("GSA"). Bedford denied that these negotiations had produced a valid lease and counterclaimed for damages arising from the government's continued occupancy after the old lease had expired. At about the same time, Bowery brought an action to quiet title to the premises in itself and to foreclose its mortgage against the interests of Bedford and the government. Proceedings in the two actions were later consolidated.
 
 
 2
 The district court denied the government's motion to dismiss Bowery's foreclosure action, 491 F.Supp. 848 (S.D.N.Y.1980), and, after a bench trial, entered final judgments denying all relief to the government, awarding substantial damages to Bedford and Bowery, foreclosing Bowery's mortgage against Bedford and the government, and ordering the government to pay rent to Bowery. 491 F.Supp. 851 (S.D.N.Y.1980). In the present appeal,[2] the government renews its contention that the district court lacked jurisdiction to adjudicate Bowery's mortgage foreclosure action and assails the final judgment entered against it. We affirm in part, reverse in part, and remand for further proceedings.
 
 I. FACTS AND PRIOR PROCEEDINGS
 A. The Relations Among the Parties
 
 3
 The relationship between Bedford and the government commenced in 1962, when GSA and Bedford executed the initial lease of 120 Church Street. The 1962 agreement provided for an initial ten year term, commencing November 1, 1963, at an annual rental of $1,949,500. The agreement gave the government two five-year renewal options, with the annual rental set at $2,115,499 during the first renewal term, and at $2,226,194 during the second. The government exercised the first renewal option in 1973, and the IRS occupied the building under the old lease through October 31, 1978. The government did not exercise its second renewal option, and the old lease expired on October 31, 1978.
 
 
 4
 Relations between Bedford and the government were never perfectly smooth. Bedford periodically complained that it was losing money under the lease; one point of contention was the government's responsibility for certain excess electricity costs, not provided for in the original agreement, that resulted from IRS's increasing use of electrical office machines. The government, for its part, often sought changes in the building's physical plant. Although the parties were able to resolve many of their differences through supplemental agreements amending the lease, their relationship was becoming rather strained toward the end of the first renewal period. Bedford complained that its losses were mounting under the old lease, while the government had determined that 120 Church Street no longer met the IRS's needs. By early 1977, the government had decided to seek improved space.
 
 
 5
 In June 1977, GSA solicited several prospective lessors, including Bedford, for offers of appropriate leases. GSA's solicitation called for offers of 317,000 square feet of space on contiguous floors, plus an option on 8000 additional square feet, with the premises to be ready for occupancy by November 1, 1978. By August 15, 1977, when the solicitation period closed, GSA had received three offers, including an offer from Bedford for the 120 Church Street building. Bedford offered 350,000 square feet at an annual rental of $3,073,000, and proposed renovations that it estimated would cost it about $1 million. GSA deemed the proposed renovations insufficient, and the offer was, on its face, for more space than the solicitation requested. The two other offers, however, were also deficient in various respects. By December 1977, GSA had rejected those offers, leaving as its only alternatives Bedford's new offer and the second renewal option under the old lease. The renewal option, for 369,000 square feet at an annual rent of $2,226,194, did not include the renovations needed by IRS.
 
 
 6
 After extensive negotiations, the rocky progress of which is recounted in detail below, and after considerable delay in processing Bedford's offer, GSA delivered to Bedford, on October 30, 1978, an award letter purporting to accept Bedford's offer, as amended through the negotiations. On December 13, 1978, GSA presented Bedford a proposed lease for execution. Under this lease, Bedford was to be paid rent at the second renewal option rate of $2,226,194 per year until renovations were completed, at which time the rent would rise to $2,902,160 per year. Bedford rejected the proposed lease by letters dated December 15, 1978, claiming that the lease did not conform with the solicitation and award and pointing out the substantial cost increases that had occurred during the year.
 
 
 7
 The parties resumed negotiations after Bedford's rejection, but no progress was made. Bedford asserted that its losses had become enormous and that the delay in commencing the proposed renovations had rendered them infeasible. The government paid rent at the second renewal option rate in November and December 1978, and then decided to deduct utilities payments in January and February 1979. On March 8, 1979, Bedford demanded additional rent and utilities payments from the government. Apparently, the government did not respond to this letter. On March 20, 1979, Bedford notified GSA that it would close the building and terminate services to it on March 23, 1979, unless the government paid "a reasonable and fair rent" for its occupancy.
 
 B. The Lawsuits
 
 8
 On March 22, 1979, the government filed suit against Bedford. As interim relief, the government sought a temporary restraining order and preliminary injunction against Bedford's threatened "lockout." For permanent relief, it sought specific performance of the new lease it said had been created through its negotiations with Bedford, including a permanent injunction against interference with its access to the building. The government also sought damages for Bedford's breach of the alleged new lease. Bedford consented to entry of a temporary restraining order against the lockout. Bowery was allowed to intervene in the action.
 
 
 9
 In the meantime, Bowery's mortgage on the building had fallen into default through Bedford's failure to pay real estate taxes and its failure to pay interest and late charges to Bowery. On March 19, Bowery demanded of Bedford an assignment of rents, and two days later filed suit against Bedford and the government. Bowery sought a declaratory judgment quieting title to the building, foreclosure of its mortgage against Bedford's and the government's interests, and an assignment of rents.
 
 
 10
 After an evidentiary hearing, the district court granted the government's motion for a preliminary injunction. The court's decree forbade Bedford to interfere with the government's occupancy of 120 Church Street, ordered the government to pay rent to Bowery at the second renewal option rate, and ordered the government to pay all utilities expenses, without setoff from its rental payments. Dissatisfied with the terms of its victory, the government appealed, arguing principally that the provision of the decree requiring it to bear utilities costs violated principles of sovereign immunity. After concluding that we had jurisdiction of the government's appeal, we affirmed the district court's imposition of the disputed term upon the United States as a condition of awarding equitable relief. We remanded the order, however, for modification of the amount of rent to be paid to Bowery and of the proportion of utilities costs to be borne by the government. United States v. Bedford Associates, 618 F.2d 904 (2d Cir. 1980).
 
 
 11
 Shortly after the preliminary injunction was entered, Bedford filed its answer to the government's complaint. Bedford denied that its negotiations with GSA had produced a lease agreement and, alternatively, argued that any agreement formed was unenforceable on grounds of unconscionability, misrepresentation, and duress. In addition, Bedford counterclaimed against the government for the fair market value rental of the premises. Later, Bedford answered Bowery's complaint in the mortgage foreclosure action, asserting that the court lacked subject matter jurisdiction of the action and that it was barred by laches, and counterclaiming against Bowery for payments from the rents Bowery was then collecting under the preliminary injunction. In May 1979, the government moved to dismiss Bowery's complaint in the foreclosure action on grounds of lack of subject matter jurisdiction. Eventually, the government answered Bowery's complaint, renewing its contention that subject matter jurisdiction was lacking and raising affirmative defenses of equitable estoppel, waiver, and unclean hands.
 
 
 12
 On remand after the first appeal, in an opinion and order dated March 18, 1980, the district court denied the government's motion to dismiss Bowery's complaint for lack of subject matter jurisdiction. Rejecting the government's argument that principles of sovereign immunity precluded Bowery's suit against it, the court held that 28 U.S.C. § 2409a (1976) permits the United States to be named as a defendant in actions "to adjudicate a disputed title to real property in which the United States claims an interest," and concluded that the government had thereby waived sovereign immunity as to an action by a mortgagee to foreclosure against the interest of the United States as occupant or lessee.
 
 
 13
 Shortly thereafter, the district court entered its final judgment and order on the merits. Briefly, the court denied all relief to the government and awarded substantial relief to Bedford and Bowery. Because a thorough understanding of the district court's findings of fact and conclusions of law is essential to our review of the judgment, we set them forth in some detail below.
 
 C. The District Court's Opinion
 1. Findings of Fact
 
 14
 The district court made extensive findings of fact concerning the expectations and conduct of the parties during the negotiations period, focusing on (a) Bedford's expectation that certain terms of the offer could be negotiated, or renegotiated, after the lease had been awarded; (b) the failure of Bedford and GSA to reach agreement on certain terms of the lease; (c) the oppressive effect of the lease upon Bedford; (d) GSA's conduct during the negotiations; and (e) Bowery's conduct.
 
 
 15
 a. Bedford's expectations concerning post-award negotiations. When GSA initially solicited offers in June 1977, it contemplated that the entire process of negotiating, obtaining congressional approval for,[3] and awarding the lease would be completed by April 1978. Because the term of the lease was not to commence until November 1, 1978, this schedule would have afforded the lessor several months in which to begin work on improvements called for under the solicitation. With this timetable in mind, the solicitation required that offers remain open until April 15, 1978.
 
 
 16
 As it happened, however, the process became delayed. For reasons unexplained, GSA did not recommend acceptance of Bedford's offer until April 1978, even though its decision to recommend the offer had been reached in November 1977. Not until June 1978 did GSA send to Congress for its approval a final prospectus concerning Bedford's offer. Because of these delays, GSA repeatedly requested Bedford to extend its offer beyond the April 15, 1978 expiration date. Bedford reluctantly granted these extensions, giving the last on September 27, 1978.
 
 
 17
 This delay sharply reduced the value of the proposed lease to Bedford. As GSA knew, Bedford had initially planned to complete the renovations called for in its bid by early 1978. As the delay in approving the lease prevented Bedford from beginning the renovations, their cost increased dramatically. Whereas Bedford's mid-1977 bid had contemplated renovation costs of approximately $1 million, by late 1978 the cost apparently had risen to some $3.8 million. In addition, utilities costs, which Bedford was to pay under the terms of its initial offer, had risen sharply.
 
 
 18
 Alarmed by these and other cost increases, which threatened it with ruin, Bedford repeatedly protested the delay and, as will be seen, sought to negotiate more favorable terms for several items of the offer. As will also be seen, the terms of some of these items were never finalized. The district court found that GSA indicated to Bedford, and Bedford reasonably believed, that all or most of these items could be renegotiated after the lease was approved and awarded. The district court also found that Bedford indicated to GSA that it did not intend to be bound by the terms of its offer with respect to the items said to be subject to: renegotiation.
 
 
 19
 b. Failure to reach agreement on certain terms. As stated above, the speedy completion of renovations at 120 Church Street was of great concern both to Bedford and to the government. On November 18, 1977, anticipating that many floors of the building would be renovated when the new lease took effect on November 1, 1978, Bedford by letter proposed to GSA that the government pay the rent called for under the second renewal option, on a pro rata basis, for any floors not renovated by November 1, 1978. Soon, however, as the processing of Bedford's offer became delayed and construction costs mounted, the firm realized that renovations could not proceed on schedule and that its November 18, 1977, proposal would not generate adequate rent. On March 2, 1978, Bedford by letter proposed instead that the government pay the first renewal option rent plus all utilities until the completion of construction or 18 months after the new lease was executed, whichever came first. The district court found that this letter withdrew the November 18, 1977 proposal. GSA decided to reject the March 2 proposal, but it did not immediately so advise Bedford; by letter dated April 5, 1978, it told Bedford that the proposal could be considered after an award was made. Although the new lease actually proffered to Bedford by GSA in late 1978 contained Bedford's November 18, 1977, proposal, the district court found that the parties had never agreed to it.
 
 
 20
 Another point on which Bedford and GSA never came to terms was the total area to be leased to the government. GSA's solicitation called for 317,000 square feet plus an option on 8000 more. Bedford's initial bid had offered the whole of 120 Church Street, containing, by its measure, 350,024 square feet. During the negotiations period, Bedford reduced the area it offered to 325,000 square feet, the total amount called for by the government's solicitation. As a result of these reductions, Bedford reasonably believed that the IRS would not occupy the whole building, as originally contemplated, and that one or two floors might be available to be leased on favorable terms to another tenant. By late 1977 and early 1978, however, GSA had apparently decided that it wanted the whole building. Because the parties disputed the applicability of a "10% corridor reduction factor,"[4] they were unable to agree on the total footage in the building and hence area to be leased, Bedford believing that the building contained enough space to accommodate another tenant in addition to IRS, and GSA believing that there was room only for IRS.
 
 
 21
 The third item on which the parties never agreed was the rate for "overtime" services, i. e., building services and utilities to be furnished by the lessor after normal business hours. The government's solicitation provided that the lessor would furnish such services on request at rates to be agreed upon. Bedford proposed rates for this potentially significant item, but no specific terms were ever reached.
 
 
 22
 c. The oppressiveness of the lease. The district court found that Bedford's August 1977 offer was made in good faith and was economically viable when made. However, as a result of GSA's delay in processing Bedford's offer and the increases in construction and utilities costs, the offer became uneconomical sometime early in 1978. The government's adoption of Bedford's November 18, 1977 proposal concerning rent during the renovations period, which the court found that Bedford had withdrawn in its March 2, 1978, letter, further diminished Bedford's return under the new lease. GSA was well aware of the harsh effect of the new lease upon Bedford. The rental fixed under the new lease, about $9.16 per square foot, was substantially below both GSA's appraised fair annual rental of $11.86 per square foot and its standard level user's charge[5] of $13.00 per square foot. In January 1979, when GSA was insisting that Bedford perform according to the new lease, a GSA audit estimated that Bedford would lose some $521,616 annually if it did perform.
 
 
 23
 d. GSA's conduct (i) Misrepresentations concerning Bedford's competition. Bedford initially offered 350,024 square feet at an annual rent of $3,073,210.72, or about $8.78 per square foot, with electricity costs included in the rent. The two other offers submitted to GSA called for substantially higher rents $14.41 per square foot in one case, and $12.07 per square foot in the other and neither included electricity. Given these substantial cost differentials, the other offers were not competitive with Bedford's offer. Despite the apparent superiority of Bedford's offer, GSA repeatedly represented to Bedford that its offer was not competitive with the others. Even after GSA had decided, unbeknownst to Bedford, to reject the other offers, and despite a provision in the bid solicitation assuring that bids would be kept confidential, GSA disclosed to Bedford certain portions of the rejected offers and represented to Bedford that its offer was not competitive with them. Through these misrepresentations concerning the extent of Bedford's competition, GSA extracted substantial concessions from Bedford that further diminished the value of the lease to Bedford.
 
 
 24
 (ii) Threats to exercise the second renewal option. GSA also exerted pressure on Bedford through repeated threats to exercise the second renewal option under the old lease. Under that lease as originally drafted, the second option was to expire if notice of intent to renew were not given 180 days before the first renewal expired. GSA believed, however, that a reduction of the notice period to 30 days negotiated for the first renewal option in 1973 also applied to the second option. Thus, GSA requested a waiver of the notice requirement in September 1978. Bedford, although believing that the government's right to renew had expired, ultimately granted the waiver in order to avoid litigation and on the understanding that the government would not exercise the second option if the new lease were approved. As early as November 1977, both GSA and Bedford knew that exercising the second option would bring ruin to Bedford, forcing it to sell the building. Indeed, GSA estimated that Bedford would lose more than $600,000 annually under the option. Moreover, GSA knew that it could not in fact exercise the option, for IRS could not function effectively at 120 Church Street without renovations and improvements. Despite its knowledge, GSA repeatedly told Bedford that it might exercise the option unless Bedford made further concessions.
 
 
 25
 e. Bowery's conduct. The district court found that Bowery's role during the negotiations was primarily that of anxious spectator. Bowery's mortgage, as amended in 1975, required Bowery's approval of any new lease of the premises. Although Bowery never received a complete copy of Bedford's initial offer, it knew enough by September 1978 to conclude, on a preliminary basis, that the lease as then proposed would be unacceptable to Bowery. Nonetheless, the district court found that Bowery, like Bedford, believed that any award made as a result of Bedford's offer would not be binding with respect to certain apparently open terms, but would merely serve as starting point for post-award negotiations. In particular, Bowery understood that the area to be leased and the responsibility for utilities costs were subject to further negotiations, and it reasonably believed that the lease might be profitable if favorable terms were reached.
 
 
 26
 2. Conclusions of Law.
 
 
 27
 The district court's conclusions of law flowed directly from the findings of fact stated above. In the government's action against Bedford, the court held that the negotiations between Bedford and GSA had failed to produce an agreement because (1) Bedford had indicated to GSA that it did not intend to be bound by its original offer (see 1.a. above); and (2) certain essential terms of the agreement were never finalized by the parties (see 1.b. above). Thus, in the district court's view, the parties had not reached the "meeting of the minds" essential to formation of a contract. Alternatively, the court held that any contract formed between Bedford and the government was unconscionable, and therefore unenforceable, because (1) the terms of the agreement oppressively favored the government (see 1.c. above); and (2) GSA agents had engaged in misconduct, tantamount to misrepresentation and duress, in negotiating the agreement (see 1.d. above). Accordingly, the court dismissed the government's action for specific performance of, and damages under, the new lease and awarded Bedford damages on its counterclaim for the government's occupancy of 120 Church Street after expiration of the old lease on October 31, 1978.
 
 
 28
 In Bowery's action against Bedford and the government, having found Bedford's mortgage in default, the court declared that Bowery's mortgage had priority over the government's tenancy, foreclosed the mortgage against both defendants, and ordered the government to pay to Bowery, commencing June 1, 1980, the fair market value rental as of that date for continued occupancy of the premises. The court rejected the government's contentions that Bowery had behaved inequitably, and was therefore not entitled to the equitable remedy of foreclosure, because it had allegedly concealed from GSA its intention to disapprove the new lease, thus leading the government to permit the second renewal option to expire. The court concluded that Bowery had not decided to disapprove the lease, but was awaiting the outcome of post-award negotiations before reaching a decision (see 1.e. above), and that its conduct was therefore innocent. Finally, the court reaffirmed its ruling that 28 U.S.C. § 2409a provided subject matter jurisdiction to adjudicate Bowery's mortgage foreclosure action.
 
 
 29
 The court determined that the annual fair market rental of the building as of the date of trial was $4,533,350, without offset for utilities, and, giving recognition to the assignment of rents to Bowery under the preliminary injunction, it entered a final judgment, fixing the rights and liabilities of the parties. The judgment, in pertinent part, (1) granted foreclosure of the mortgage as requested by Bowery, and quieted title to the building in Bowery; (2) declared that since November 1, 1978, the United States had no contractual right, title or interest in the building other than as a holdover tenant, and that the United States' tenancy was subordinate to Bowery's mortgage; (3) awarded Bedford damages against the government in the amount of $462,507.33, plus interest and costs, representing the excess of fair market rental over the amounts paid by the government to Bedford from November 1978 through February 1979; (4) awarded Bowery damages against the government in the amount of $1,252,673.96, plus interest and costs, representing the excess of fair market value over the amounts paid by the government to Bowery from March 1979 through May 1980; and (5) ordered the government to pay rent to Bowery at an annual rate of $4,533,350, without offset for utilities, for continued occupancy of the building after June 1, 1980.
 
 D. The Government's Contentions on Appeal
 
 30
 The government assails the district court's conclusion that negotiations between Bedford and GSA did not produce an enforceable lease. With respect to the conclusion that the parties' failure to agree on certain terms precluded formation of a contract, the government argues that the court's findings of fact concerning these open terms were clearly erroneous, and that as a matter of law these terms were not so essential as to preclude agreement. With respect to the court's conclusion that the lease was unconscionable, the government again attacks the findings of fact, and argues that as a matter of law neither GSA's conduct nor the terms of the agreement barred its enforcement as written. In addition, the government contends that the district court lacked jurisdiction to award Bedford damages on its counterclaim, and that Bedford can obtain damages only in the Court of Claims.
 
 
 31
 In its appeal from the judgment against it in Bowery's suit, the government renews its contention that 28 U.S.C. § 2409a does not confer jurisdiction of a mortgage foreclosure action. Briefly, the government contends that § 2409a confers jurisdiction only of quiet-title actions, not of foreclosure actions, and that the sole waiver of sovereign immunity with respect to foreclosure actions is found in 28 U.S.C. § 2410, which permits suit against the United States in foreclosure proceedings if the government asserts a lien on or security interest in the premises. Because the government does not claim a lien or security interest respecting 120 Church Street, it asserts that §§ 2409a and 2410 leave Bowery powerless to foreclose against it. In addition, the government contends that as to the fairness of Bowery's conduct during the negotiations period the district court's findings were clearly erroneous. Finally, the government contends that even if Bowery's action is not completely barred, the district court erred in using the fair rental value of 120 Church Street as of the date of trial rather than November 1, 1978, when the old lease expired, and that the court wrongly denied the government its right, under 28 U.S.C. § 2409a, to elect to vacate or to condemn the premises, rather than to continue occupancy at the fair rental value.
 
 
 32
 Although we conclude that most of the district court's findings of fact were not clearly erroneous, we nevertheless agree with the government that its negotiations with Bedford produced an enforceable lease. We therefore vacate so much of the district court's order as dismissed the government's action for damages under the lease and reverse its award of damages to Bedford. We conclude, however, that the district court acted within its discretion in denying specific performance of the lease, and declaring, therefore, that after November 1, 1978 the government had no right to occupy the premises except as a holdover tenant. Accordingly, we affirm the judgment insofar as it denied equitable relief to the government, and we remand the matter for trial of the government's action for damages.
 
 
 33
 In Bowery's action, we hold that 28 U.S.C. § 2409a permits Bowery to seek foreclosure here against the United States. Because we cannot say that the district court clearly erred in its factual findings concerning Bowery's conduct, we affirm the judgment below insofar as it foreclosed the mortgage, quieted title in Bowery, and ordered an assignment of rents. However, in keeping with our holding that the government's lease was valid and enforceable, we remand the matter for reduction of the rent due Bowery to reflect the rent due under the new lease.
 
 II. THE GOVERNMENT'S LEASE
 A. The Existence of an Agreement
 
 34
 In holding that Bedford and GSA had not established a contract for the lease of 120 Church Street, the district court relied on two related principles of general contract law. First, negotiations and preliminary agreements do not establish a contract if one party manifests to the other an intent not to be bound by the agreement until other terms are agreed upon or until the entire agreement has been reduced to writing. Restatement (Second) of Contracts § 25, (tent. draft no. 1 1964); id. § 26, Comment b. Second, a contract is not formed if its essential terms remain indefinite. Brookhaven Housing Coalition v. Solomon, 583 F.2d 584, 593 (2d Cir. 1978); Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673, 676-77 (2d Cir. 1972). Applying these principles, the district court concluded that the Bedford-GSA negotiations did not establish a contract (1) because Bedford had indicated to GSA that it did not intend to be bound by its initial offer until certain terms were agreed upon; and (2) because those terms were essential to the agreement and remained open. We disagree on both points and hold that the negotiations formed a contract.
 
 
 35
 1. Bedford's intent not to be bound. We assume the correctness of the district court's explicit findings that "Bedford clearly did not intend to be bound (by its offer) until the outstanding items had been resolved" and that "Bedford's intent not to be bound and its belief that terms would be renegotiated after an award was made were manifested to the Government," 491 F.Supp. at 863. Similarly, we accept, as a matter of general contract law, the proposition that negotiations cannot form a contract if one party to them indicates to the other his intention not to be bound until some later time. Bedford, however, was not an ordinary commercial landlord: it sought its rents from public funds. Viewed against the statutes and regulations applicable to the procurement of government leases, Bedford's conduct in repeatedly extending the life of its offer precluded a holding that GSA's award of the lease to Bedford could not create a contract.
 
 
 36
 Federal policy favors purchase, rather than leasing, of property, on the ground that ownership is more economical in the long run. See, e. g., H.R.Rep.No. 94-1584 (pt. I), 94th Cong., 2d Sess. 2 (1976), reprinted in (1976) U.S.Code Cong. & Ad.News 5558, 5559 (accompanying 1976 amendments to Public Buildings Act of 1959). Although Congress has long recognized that leasing is necessary in some circumstances, it has mandated certain standards and procedures to be applied to proposed government leases in order to ensure that they are truly advantageous to the United States. Thus, the Economy Act of 1932, 40 U.S.C. § 278a (1976), forbids GSA to recommend a lease if the annual rental under it exceeds 15% of the fair market value of the property. And § 7(a) of the Public Buildings Act of 1959, 40 U.S.C. § 606(a)(1976), requires GSA to submit proposed leases requiring an annual rent in excess of $500,000 to the Public Works Committees of both Houses of Congress for their approval. Thus, the Economy Act ensures that the government will not agree to excessive rentals, while the Public Buildings Act permits Congress to review the overall propriety of major leases.
 
 
 37
 GSA has adopted various procedures to carry out these congressional mandates. In its usual solicitation of offers of major leases, it requires that prospective lessors hold their offers open for a certain period, during which GSA can negotiate needed changes and determine which offer to recommend. Pursuant to § 7(a) of the Public Buildings Act, it then prepares and submits to Congress a prospectus concerning the offer recommended for acceptance; the prospectus describes, inter alia, the space to be leased and "the maximum cost" of the lease to the United States. GSA delivers the United States' unconditional acceptance of an offer once Congress has approved it.
 
 
 38
 As a lessor to the government since 1962, Bedford was undoubtedly familiar with these procedures.[6] Under GSA's June 1977 solicitation, Bedford's August 15 offer was to remain open until April 15, 1978. As the district court found, Bedford knew by March 2, 1978, that its initial offer, as modified, would prove uneconomical for it. Nonetheless, and regardless of the fact that GSA had by then become intransigent about further modifications of the offer to be submitted to Congress and had so notified Bedford on April 5, 1978, Bedford extended the life of its offer on no fewer than seven occasions from February 28, 1978 to September 27, 1978. In view of Bedford's manifest willingness to permit GSA to go forward with the approval process a process that Bedford should have known would lead to acceptance of its offer Bedford cannot now be heard to say that its offer was incapable of acceptance. To uphold such a claim, as the district court did, would permit lessors such as Bedford, and indeed GSA itself, to evade statutory limitations on the procurement process and to frustrate Congress's supervision of that process. Accordingly, as a matter of federal law and regardless of the status of the bargain under general contract law,[7] we hold that Bedford's extension of its offer empowered GSA to accept that offer, and that GSA's delivery of the award letter on October 30, 1978, created a valid contract.
 
 
 39
 We reach this conclusion even though GSA may have known that Bedford believed that its offer was not binding and that further negotiations would follow the award. GSA was not at liberty to present to Congress merely a bundle of "suggestions" concerning 120 Church Street, disguised, in the trappings of a formal prospectus, as a definite offer respecting the premises. Moreover, given the federal statutes and regulations that circumscribed GSA's actions in this matter and Bedford's status as a substantial commercial entity and longtime government lessor, any belief on Bedford's part that GSA would violate its congressional mandate was unreasonable as a matter of law. As for the prospect of further negotiations, we think this raises at most a possibility that Bedford and GSA "agreed to agree" upon troublesome terms at a later time. As discussed above, we cannot suppose that Bedford and GSA meant to renegotiate the lease in toto after Congress had approved it. The parties' willingness to conduct post-award negotiations therefore does not preclude the existence of an agreement in the meantime.
 
 
 40
 2. The effect of the open terms. In holding that there was no "meeting of the minds" and therefore no contract, the district court also relied on the parties' inability to agree on the rent to be paid during the renovations, the area to be leased, and the rate for overtime services. In the court's view, the existence of these disputed terms rendered the proposed lease substantially indefinite and therefore void. We disagree. Neither the terms themselves nor the asserted disagreements concerning them were so significant as to preclude enforcement of the parties' bargain.
 
 
 41
 An agreement need not spell out all details of the bargain in order to be enforceable. Even if the parties have left some terms of their agreement indefinite, a court may enforce the agreement if it has means of giving content to the indefinite terms, see, e. g., Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 453-54 (2d Cir. 1977); 1 Corbin on Contracts § 97, at 426 (1963), or if those terms are not material to the bargain, see, e. g., United States v. City of New York, 131 F.2d 909, 915 (2d Cir. 1942), cert. denied, 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1149 (1943). The district court erred in failing to apply these principles to Bedford's agreement with the government.
 
 
 42
 We begin with the parties' apparent inability to agree on the square footage to be leased. The district court found that Bedford and GSA had disputed the applicability of the "10% corridor reduction factor" and concluded that they had not agreed on the dimensions of the space to be leased. There were adequate means for resolving this disagreement. GSA's solicitation, which was part of the submission to Congress and became part of the agreement upon the government's acceptance of Bedford's offer, provided that the dispositive measurement of the leased space was to be a mutual field measurement after delivery of the space and that any disagreement would be resolved through administrative proceedings. These modes of resolving the dispute were eminently practicable, and the district court should have remitted the parties to them. See generally 1 Corbin on Contracts, supra, § 98 at 433-38. In addition, the total area in dispute about 5% of the leased space[8] was relatively insignificant. Thus the uncertainty concerning this term was not so great as to preclude enforcement of the agreement.
 
 
 43
 Similarly, the rate for overtime services was susceptible of resolution and was a relatively small part of the bargain. Bedford and GSA had frequently negotiated agreements concerning such "extra" charges in the past, and the court could have reviewed this prior course of dealing, as well as standard practices in the industry, to set a reasonable rate. See Lee v. Joseph E. Seagram & Sons, Inc., supra. In addition, even if we accept the district court's finding that overtime charges might be as high as $90,000 annually under the new lease,[9] that amount is comparatively insignificant in view of the annual rental of some $2.9 million.
 
 
 44
 Finally, we turn to the problem of the rent to be paid during renovations. The district court found that Bedford had withdrawn its November 18, 1977, proposal, calling for payment of the second renewal option rent on a pro rata basis for unrenovated floors, by means of its March 2, 1978, letter, which proposed that the government instead pay the first renewal option rent plus all utilities. The government attacks this finding as clearly erroneous, and argues that, as a matter of law, Bedford could not withdraw its November 1977 proposal without GSA's consent while its offer was held open. For its part, Bedford contends that it was free to withdraw the November 1977 proposal at any time, that it did so through its March 1978 proposal, and that GSA's failure to adopt the latter proposal rendered the term indefinite. We think that Bedford must be held to the terms of its November 1977 proposal, and that the agreement was therefore definite.
 
 
 45
 Were this an ordinary commercial case involving private parties, we would very likely uphold the district court on this point. Although Bedford's offer provided that it would remain open for a specified time, nothing in the record indicates that the government gave any consideration for this feature of the offer or took any action, beyond negotiating with Bedford, in reliance on it. In the ordinary commercial setting, therefore, no option contract would have been formed, and Bedford would have remained free to withdraw its offer at any time. See generally Restatement (Second) of Contracts §§ 35, 41, 35A, 45 (tent. draft no. 1 1964); 1 Corbin on Contracts, supra, §§ 38, 43; 1 Williston on Contracts §§ 55, 61, 61A (3d ed. 1957). In these circumstances, Bedford's March 1978 proposal might have sufficed to withdraw the November 1977 proposal, for it would at least have suggested to the government that Bedford no longer meant to be bound by the earlier proposal.[10] Because GSA never acceded to the March 1978 proposal, the term would have remained indefinite. The term was significant, and its indefiniteness might well have compelled the conclusion that the parties had not formed a contract.
 
 
 46
 In the realm of government leases, however, things are necessarily otherwise. Unlike an ordinary commercial contractor, and indeed unlike an ordinary government contractor, a prospective lessor to the government may be required to hold his offer open for a reasonable period of time even in the absence of an option contract. In general, GSA's Federal Procurement Regulations (FPR) specify that solicitations for offers must permit withdrawal of offers at any time prior to award. 41 C.F.R. §§ 1-3.802-1(a), 1-3.802-2(a) (1979). These regulations, however, are aimed primarily at contracts for the purchase of goods and services, and by their terms they apply to leases of real property "only to the extent explicitly stated in specific FPR provisions." Id. § 1-1.004-1.[11] The FPR regulations governing withdrawals of offers do not mention leases, see id. §§ 1-3.802-1, 1-3.802-2, and GSA regulations governing leasing procedures do not address withdrawals of offers, see 41 C.F.R. §§ 101-18.100 to 18.107 (1980). GSA's practice is to require that offers be held open long enough to permit the agency and Congress to conduct the review required under the Economy Act and the Public Buildings Act, see GSA, Acquisition of Leasehold Interests in Real Property: A GSA Handbook ch. 2-9 at 6 (various dates), and this practice has ample warrant in federal law. Congress and the agency could hardly review offers of leases in the manner required by statute if offerors were free to withdraw or alter their offers at will. Accordingly, when a solicitation for offers requires that offers remain open for a specified period, we will enforce that requirement as a matter of federal common law. See note 7, supra. Cf. United States v. Sunshine Dairy, Inc., 215 F.2d 879 (9th Cir. 1954); United States v. Lipman, 122 F.Supp. 284 (E.D.Pa.1954). For so long as an offeror holds his offer open in compliance with GSA's reasonable requirements, he may not withdraw or modify the offer without GSA's consent.
 
 
 47
 Under these principles, the clause of GSA's June 1977 solicitation requiring Bedford to hold its offer open until April 15, 1978, was fully effective. Bedford was not free to alter or withdraw the offer unilaterally, so long as it was held open. Accordingly, as a matter of federal law, the March 1978 proposal, to which GSA did not assent, was ineffective to withdraw the November 1977 proposal, which GSA had adopted. The latter proposal remained in the offer and was validly accepted upon delivery of the award. The term concerning rent during renovations was therefore fixed as that set forth in Bedford's November 1977 proposal, and it was not indefinite.
 
 
 48
 In sum, we hold that the lease agreement was not void for indefiniteness.
 
 B. The Enforceability of the Agreement
 
 49
 The district court concluded that even if Bedford and the government had formed a contract, that contract was unenforceable because its terms, and GSA's conduct in negotiating it, were unconscionable. We do not think that either the terms of the lease or GSA's bargaining methods were so oppressive as to preclude enforcement of the agreement in a suit for damages. Nonetheless, recognizing that specific performance is an equitable remedy and that GSA's conduct may not have met equity's exacting standards, we reverse the judgment below insofar as it denied damages to the government, and we affirm the district court's denial of specific performance as a proper exercise of its discretion.
 
 
 50
 The doctrine of unconscionability protects against unfair bargains and unfair bargaining practices. See generally Williams v. Walker-Thomas Furniture Co., 350 F.2d 445 (D.C.Cir.1965); Geldermann & Co. v. Lane Processing, Inc., 527 F.2d 571 (8th Cir. 1975). Unconscionability is determined by reference to the relative benefit of the bargain to the parties at the time of its making, the nature of the methods employed in negotiating it, and the relative bargaining power of the parties. Williams, supra; Geldermann, supra; 1 Corbin on Contracts, supra, § 128. We may assume the applicability of the doctrine to government leases of real property,[12] and further assume the correctness of the factual findings on which the district court based its conclusion of unconscionability. Nonetheless, we conclude that the doctrine should not have been applied in the instant case.
 
 
 51
 First, we reject out of hand the proposition that the new lease was so onesided as to be unconscionable. Bedford was to receive nearly $3 million annually once renovations were completed. Over the possible 20-year life of the lease, it would have received well over $60 million. The fact that Bedford might lose substantial sums and suffer foreclosure even at these rates does not render its bargain unenforceable. The law does not guarantee a profit. "Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 67-68, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978). To this, we would add that the parties are free to contract as they wish even if they perceive the unwisdom of the bargain for one of them, absent a disparity more shocking than that found here.
 
 
 52
 Similarly, we do not think that the government's conduct during the negotiations period rendered the agreement unconscionable. Significantly, the district court did not make any findings concerning customary practices in real estate transactions generally or in government transactions. To that extent, therefore, it did not apply the proper legal standard. The doctrine of unconscionability condemns specific bargains and bargaining techniques only if they are grossly unfair "according to the mores and business practices of the time and place." Geldermann, supra, 527 F.2d at 576, and Williams, supra, 350 F.2d at 450, both quoting 1 Corbin on Contracts, supra, § 128 at 551. Moreover, while the government should conduct itself equitably in all matters, and while GSA's conduct may have fallen somewhat short here, we do not view the practices engaged in as unconscionable under any reasonable standard. In reaching its contrary conclusion, the district court relied on its findings that GSA had misrepresented to Bedford that the lease could be renegotiated after an award was made, that it had wrongfully threatened to exercise the second renewal option, and that it had misrepresented the extent of Bedford's competition. The first of these points is inadmissible; as we noted above, Bedford must be charged with knowledge of the fact that any award in its favor would create a binding contract. While there may have been an agreement to agree later on additions or modifications, this did not prevent the formation of a contract upon the government's acceptance of Bedford's bid. The second point is also unsound. As the district court found, Bedford and GSA disputed the availability of the second renewal option after April 1978. The government's "threat" to exercise what it believed to be its legal right was scarcely conduct that was egregious.[13] Finally, although GSA's statements concerning Bedford's competition may have gone beyond "hard bargaining in the interest of the Government," Johnson, Drake & Piper, Inc. v. United States, 531 F.2d 1037, 1043 (Ct.Cl.1976), they were hardly enough, standing alone, to invalidate the entire transaction.
 
 
 53
 Our convictions in this regard are strengthened by our appraisal of the parties' status. The doctrine of unconscionability seeks to redress the inequities that sometimes result when superior commercial sophistication is brought to bear in a situation of grossly unequal bargaining power. See Geldermann, supra; Williams, supra; U.C.C. § 2-302, Comment 1. The substance and sophistication of the party seeking to avoid an agreement on grounds of unconscionability are therefore highly relevant to the judicial inquiry. Bedford's means and expertise were substantial. It owned an office building that was appraised at some $12.6 million, as well as several commercial properties. It was a longtime lessor to the government, and it was advised by counsel at every step of the way. Although the government's economic power was undoubtedly far superior to Bedford's, Bedford's ability to negotiate numerous changes in its offer prior to the award indicates that the disparity was not crushing. In short, Bedford was not the sort of entity that "could be easily deceived or taken advantage of," Geldermann, supra, 527 F.2d at 576, and we decline to extend for it the safety net of unconscionability.
 
 
 54
 Nonetheless, we affirm the judgment of the district court insofar as it denied specific performance to the government. Specific performance is an equitable remedy, committed to the district court's sound discretion. As an equitable remedy, it may be denied to a party whose own conduct is inequitable. See generally 5A Corbin on Contracts § 1167 (1964). This is so even though the plaintiff's conduct was not so egregious as to constitute a defense in law. For example, specific performance may be denied on grounds of misrepresentation even if the misrepresentation was innocent or if the other party did not rely on it. See id. § 1167, at 238-241. In light of the district court's conclusion that the contract was unconscionable, and particularly in light of its specific findings that GSA sometimes dealt with Bedford in bad faith, we have no doubt that the court would have declined to order specific performance of the new lease even if it had taken the view of the applicable law set forth above. Had the district court done so, it would have been well within its discretion. Because no useful purpose would be served by remanding the matter to the district court for the exercise of its discretion,[14] we reverse the judgment insofar as it dismissed the government's action for damages, and we affirm it insofar as it denied specific performance.
 
 III. BOWERY'S MORTGAGE
 
 55
 It is undisputed on this appeal that Bowery's mortgage on 120 Church Street was valid and was in default, and Bedford has not appealed the judgment of foreclosure. Thus, the only questions for our decision are whether the district court had jurisdiction to foreclose the mortgage against the leasehold interest of the United States[15] and, if it did, whether Bowery's conduct nonetheless precluded a judgment in its favor. We conclude that Bowery was entitled to its remedy on both points, and we affirm the judgment of the district court insofar as it foreclosed the mortgage, quieted title in Bowery, and ordered an assignment of rents.
 
 A. Jurisdiction
 
 56
 Bowery contends that 28 U.S.C. § 2409a confers subject matter jurisdiction of an action to foreclose a mortgage against the interest of the United States as lessee. The government contends that it does not, and that Bowery's action is therefore barred by the doctrine of sovereign immunity. Cf. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) (sovereign immunity generally bars specific relief against the United States). We agree with the conclusion of the district court that § 2409a provides the necessary waiver of sovereign immunity.
 
 
 57
 Section 2409a provides in pertinent part as follows:
 
 
 58
 § 2409a. Real property quiet title actions
 
 
 59
 (a) The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not ... apply to or affect actions which may be or could have been brought under sections 1346, ... or 2410 of this title ....
 
 
 60
 (b) The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control.
 
 
 61
 (c) The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.
 
 
 62
 The government argues that the statute is, by its terms, limited to actions "to adjudicate a disputed title," and that Bowery's action is not maintainable under the statute because the title to 120 Church Street is not in dispute.
 
 
 63
 The district court rejected this argument on the basis of its reading of Bowery's complaint and the status of the claims alleged in the complaint under local property law. Bowery's first cause of action sought a declaratory judgment to the effect that the government's lease was invalid and that even if the lease were not invalid, it was subordinate to Bowery's mortgage. The district court reasoned that even apart from Bowery's second cause of action, which the parties have characterized as a "garden variety" foreclosure action, the first cause of action sought to remove a cloud from the title to the property by obtaining an adjudication of the parties' rights. Given this "quiet title" purpose, the court concluded that § 2409a permitted the action. In addition, recognizing that state law would necessarily supply the rule of decision for many issues under § 2409a, the district court held that Bowery's action could proceed under § 2409a because it would be characterized as a "quiet title" action under applicable state law.
 
 
 64
 While the government's lease undoubtedly affected Bowery's ability to convey good title to 120 Church Street as long as the relative priorities of lease and mortgage remained undetermined, the district court's analysis of Bowery's complaint does not fully explain why § 2409a permitted the court to go beyond an adjudication of priorities and order foreclosure against the government. In addition, while we agree that state law will be dispositive in determining many issues under § 2409a,[16] we do not think that the state law characterization of a particular cause of action will determine the scope of § 2409a. The meaning of the phrase "adjudicate a disputed title" presents a federal question, the answer to which must be sought in federal law. Accordingly, we must squarely confront that question and determine whether § 2409a permits a mortgage foreclosure action to proceed against a leasehold interest of the United States.
 
 
 65
 The language and history of the statute persuade us that it does. First, the statutory language casts a wide jurisdictional net. Although the caption of § 2409a refers to "quiet title actions," the statute itself plainly permits a variety of suits besides the typical quiet title action, in which adverse claimants to real property seek an adjudication of title as between themselves. Under § 2409a, the dispute need not present a question of title as to the United States. Rather, the "disputed title" question must involve "property in which the United States claims an interest." The reference in § 2409a(c) to the "right, title or interest" of the United States confirms the impression that the interest asserted by the government need not be a "title" or ownership interest. Rather, § 2409a permits the government to be named as a defendant whenever it claims an interest in real property that is "adverse," § 2409a(d), to that of the plaintiff. In addition, the reference to the plaintiff's "right, title or interest" in § 2409a(c) suggests that the plaintiff need not claim "title" to the property in order for his action to proceed under § 2409a. Thus, the language of the statute indicates that the phrase "adjudicate a disputed title" does not limit the waiver of sovereign immunity under § 2409a to traditional title disputes. The statute plainly contemplates litigation against the United States to adjudicate disputes about lesser interests, such as Bowery's mortgage and the government's lease.
 
 
 66
 In addition, the legislative history shows that Congress used the concept of "quieting title" as a shorthand for almost any variety of suit concerning interests in land. The House Report states that § 2409a would permit suit against the United States by one who claimed an estate less than fee simple. Indeed, it states that a prospective plaintiff under § 2409a might claim no more than an easement or mineral rights. See H.R.Rep.No.92-1559, 92d Cong., 2d Sess. 6 (1972), reprinted in (1972) U.S.Code Cong. & Ad.News 4547, 4552. Surely the interest of a mortgagee an interest that may empower him to force a sale of the property is no less substantial than these examples that were before Congress. Thus, we think that a mortgage foreclosure action such as Bowery's is an action "to adjudicate a disputed title" within the meaning of 28 U.S.C. § 2409a.
 
 
 67
 The government's strongest argument for a contrary view rests on a reading of § 2409a against 28 U.S.C. § 2410. Whereas § 2409a does not in terms refer to mortgage foreclosure actions, § 2410 does. It confers subject matter jurisdiction upon the district court "to foreclose a mortgage or other lien upon ... real or personal property on which the United States has or claims a mortgage or other lien." 28 U.S.C. § 2410(a)(2). From this explicit mention of foreclosure actions in § 2410, the government infers that § 2410 is the exclusive jurisdictional statute permitting foreclosure. Because the government does not claim a "mortgage or other lien" on 120 Church Street, it argues that Bowery's action is precluded.
 
 
 68
 Although the question is a relatively close one, we think the government makes too much of the specificity of § 2410. That rather complex statute is designed to resolve several specific problems that arise in the adjudication of disputes concerning property in which the government is interested as a secured creditor.[17] As observed by the House committee report with respect to § 2409a, "(t)itle 28, United States Code, section 2410, allows suits to be maintained when the Government's claim is in the nature of a security interest only." H.R.Rep.No. 92-1559, supra, at 6, reprinted in (1972) U.S.Code Cong. & Ad.News at 4551. (Emphasis added.) Thus it is not surprising that § 2410 mentions mortgage foreclosure actions in express terms, for such actions will frequently be the setting of conflicts between the United States and other secured creditors. By contrast, the generality of § 2409a reflects its broader purpose. As discussed above, § 2409a is an all-purpose jurisdictional statute, excepting only such actions as are otherwise specifically covered by other statutory provisions, and is designed to permit adjudication of a wide range of disputes involving "title," as broadly conceived by Congress, to land in which the United States has an interest. Section 2409a could not be made more specific without jeopardizing the very flexibility with which Congress sought to endow it. Thus we do not think that § 2410 should be read to limit the scope of § 2409a, and we conclude that the district court had jurisdiction to foreclose Bowery's mortgage.
 
 B. The Government's Equitable Defenses
 
 69
 At trial, the government contended that even if there were jurisdiction to hear Bowery's suit, Bowery should be barred from foreclosure because of its assertedly inequitable conduct. Specifically, the government alleged that Bowery had concealed from the government its intention to disapprove the new lease, thereby causing the government to proceed with negotiations on the lease and to permit its second renewal option to expire. The district court rejected the government's defenses, finding that Bowery believed that the lease was subject to renegotiation after the award and that it had therefore not formed an intention to disapprove it. The government attacks these findings as clearly erroneous. They were not, and we affirm.[18]
 
 
 70
 IV. REMAINING CONTENTIONS AND THE ISSUES ON REMAND
 
 
 71
 Our holdings that the government's lease was valid but that specific performance was properly denied dispose of the remaining contentions in these appeals. Because the government's lease was valid, Bedford was not entitled to damages on its counterclaim for wrongful occupancy, and that portion of the judgment in its favor must be reversed. On remand, the district court must adjudicate the government's claim for damages under the lease. In doing so, it should give content to the terms of the lease concerning the area to be demised and the rate for overtime services, and we think it would be germane to consider whether GSA's delay in securing congressional approval of the lease constituted a lack of cooperation sufficient to excuse Bedford from its obligation to renovate the premises within the period set forth in the lease. Of course, we leave the precise scope of the trial to the parties and to the district court's sound discretion.
 
 
 72
 Similarly, because the lease was valid, the government did not effect a taking through its occupancy of the building after October 31, 1978, and Bowery was entitled to receive only the rental specified by the lease agreement. On remand the district court must modify the assignment of rents to Bowery under the decree to reflect this lower rental rate.
 
 
 73
 Finally, we address the problem of the government's continued occupancy of 120 Church Street in light of our disposition of these appeals. Because we have upheld the district court's denial of specific performance to the government and its foreclosure of Bowery's mortgage against the government's leasehold, the government would have no present right to remain in the premises under principles of property law applicable to private actors. Section 2409a, however, is solicitous of the need to avoid interference with government operations, see H.R.Rep.No. 92-1559, supra, at 6, reprinted in (1972) U.S.Code Cong. & Ad.News at 4552, and it does not countenance eviction or ejectment of the United States. The statute expressly provides that "(t)he United States shall not be disturbed in possession ... of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days." 28 U.S.C. § 2409a(b). The section further provides that the government may elect to retain possession of the premises if the "final determination" of the action is "adverse" to it, provided that it pays just compensation, as determined by the district court having jurisdiction of the action, to the property owner. Id. Because we have concluded that the government is not entitled to specific performance of its lease, our decision is "adverse" to its possessory interest. Under § 2409a(b), the government will have sixty days from the issuance of our mandate on this appeal, which we take to be the "final determination" referred to in the statute, in which to make its election either to vacate the premises or to condemn some interest in them.
 
 
 74
 In the event that the government elects to condemn an interest in the premises, we think it plain that just compensation for the taking so accomplished must be determined as of the date of the government's statutory election. Throughout the proceedings in this case, the government has disclaimed any exercise of its power of eminent domain, and has vigorously contended that it occupies 120 Church Street by contractual right. Because the government's occupancy has been merely the assertion of a contract right, it was not a seizure of the premises within the contemplation of cases such as United States v. Dow, 357 U.S. 17 (1958). This is true even though, as we have held above, the government's lease was not specifically enforceable. The government cannot be said to have taken property merely because its good faith estimate of the enforceability of its contractual rights later proves mistaken. Cf. J.D. Hedin Construction Co. v. United States, 456 F.2d 1315, 1328-29 (Ct.Cl.1972); Acme Process Equipment Co. v. United States, 347 F.2d 509, 537-38 (Ct.Cl.1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Accordingly, any taking of an interest in 120 Church Street can occur only after the government has abandoned its insistence upon its contractual right to occupy the building, as it must after our rejection of its claim for specific performance, and asserts a right to occupancy based upon its prerogatives as sovereign.
 
 
 75
 In conclusion, we reverse the judgment of the district court insofar as it dismissed the government's action for damages and awarded damages to Bedford; modify it insofar as the monetary award to Bowery was based on fair market rental of the property rather than the rental specified in the lease; and affirm it insofar as it denied specific performance to the government, declared that the government no longer has a leasehold interest in 120 Church Street, foreclosed Bowery's mortgage, quieted title to the building as requested by Bowery, and awarded Bowery an assignment of rents. We remand the matter for adjustment of the rental due Bowery under the decree, for trial of the government's action for damages, and for such other proceedings as may be appropriate. No costs.
 
 
 76
 Judge Moore reserves the right to file a separate opinion at a later date.
 
 MOORE, Circuit Judge (dissenting):
 
 77
 I dissent.
 
 
 78
 Important agencies of government, the Internal Revenue Service (IRS) and the General Services Administration (GSA) are involved. The IRS has occupied, pursuant to a lease executed in 1962 between GSA and Bedford, the owner of the building, a 21 story building known as 120 Church Street in lower New York City. In my opinion the majority bases its decision on an extraordinary principle saying that: "Moreover, in the setting of the present case, we (the Court of Appeals) have ample power to construct rules of federal common law that may vary from the principles of general contract law". At ----. The "rules" which the majority would construct would be the elimination of the centuries-old fundamental essential of a valid agreement, namely, that before a valid contract comes into existence, there must be a "meeting of the minds" of the parties. Despite this conceded deficiency, the majority would foist upon Bedford a lease to which as the district court found (and these findings were not reversed or held to be clearly erroneous) "Bedford clearly did not intend to be bound until outstanding items had been resolved" and that "Bedford's intent not to be bound and its belief that terms would be renegotiated after an award was made were manifested to the government". 497 F.Supp. at 863. Nevertheless, the majority concludes that "as a matter of federal law and regardless of the status of the bargain under general contract law (footnote omitted), we hold that Bedford's extension of its offer empowered GSA to accept that offer, and that GSA's delivery of the award on October 30, 1978, created a valid contract". At ----. This conclusion is followed by the rejection of an equally time-honored principle of contract law by saying: "We reach this conclusion even though GSA may have known that Bedford believed that its offer was not binding and that further negotiations would follow the award". At ----. The majority "assume the correctness of the district court's explicit findings that 'Bedford clearly did not intend to be bound (by its offer) until the outstanding items had been resolved' and that 'Bedford's intent not to be bound and its belief that terms would be renegotiated after an award was made were manifested to the Government, 491 F.Supp. at 863.' " The opinion accepts "as a matter of general contract law, the proposition that negotiations cannot form a contract if one party to them indicates to the other his intention not to be bound until some later time". At ----. However, it pushes aside this fundamental contract principle, saying: "Bedford, however, was not an ordinary commercial landlord; it sought its rents from public funds", At ----, and holding "that the negotiations formed a contract". At ----. If the negotiations formed a contract, this conclusion cannot be reconciled with the opinion's assertion that "GSA's delivery of the award letter on October 30, 1978, created a valid contract". At ----. The offer which GSA was purporting to accept was the offer in Bedford's August 15, 1977 proposal, as amended. This offer was followed by some fifteen months of fruitless negotiations. The district court found that "It is also clear that the Government and Bedford did not reach an agreement on a number of material terms". In my opinion the court's finding that "there was no meeting of the minds as to a number of essential items" is sufficient to justify its conclusion that "no contract was made".
 
 
 79
 The majority acknowledges the district court's reliance upon "the parties' inability to agree on the rent to be paid during the renovations, the area to be leased, and the rate of overtime services.... (I)n the court's view, the existence of these disputed terms rendered the proposed lease substantially indefinite and therefore void". At ----. the Majority, however, belittles the importance of these unresolved terms, saying:
 
 
 80
 "We disagree. Neither the terms themselves nor the asserted disagreements concerning them were so significant as to preclude enforcement of the parties' bargain. * * * Even if the parties have left some terms of their agreement indefinite, a court may enforce the agreement if it has means of giving content to the indefinite terms ... or if these terms are not material to the bargain...." (citations omitted). At ----.
 
 
 81
 The majority disposes of the area problem by saying that there was to be "a mutual field measurement after delivery of the space and that any disagreement would be resolved through administrative proceedings", that "(T)hese modes of resolving the dispute were eminently practicable, and the district court should have remitted the parties to them." (At ----) (citations omitted). Furthermore, "the total area in dispute about 5% of the leased space was relatively insignificant ... and not so great as to preclude enforcement of the agreement". (At ----).
 
 
 82
 As to overtime rates, the opinion says that they were "susceptible of resolution (and) a relatively small part of the bargain". Furthermore, "the court could have reviewed this prior course of dealing, as well as standard practice in the industry, to set a reasonable rate". (At ----).
 
 
 83
 The majority states that a lease was presented to Congress for its approval and approved by it. The fallacy of this fact assumption is established by the exhibits in the record. The GSA letter of June 8, 1978 to the Senate Committee on Environment and Public Works, reads: "In accordance with Section 7 of the Public Buildings Act of 1959, as amended, there is submitted for consideration by the Committee a prospectus which proposes a succeeding lease for space presently occupied at 120 Church Street, New York, New York". Exh. 118. No lease was submitted; only the offer and prospectus. That a "succeeding lease" was proposed and contemplated is clear. Under the heading "LEASE PROSPECTUS 120 CHURCH STREET, LOWER MANHATTAN, NEW YORK CITY:" there is stated "GSA proposes such a lease, for a firm term of 10 years, at an annual cost of $2,902,160 or $8.32 per sq. ft. including services and utilities". That the prospectus was to authorize negotiations is equally clear: "The proposal for negotiating a 10 year succeeding lease is actually an alternative to exercising the 5-year option that GSA already has". Exh. 119.
 
 
 84
 The Senate Committee approved the 120 Church Street prospectus under date of August 16, 1978. Exh. 120. An accompanying report appears in the Congressional Record of the Senate in which it is stated: "The lessor (Bedford) will not undertake the needed work unless a new lease is negotiated". A. 1040.
 
 
 85
 During the year (1977-1978), extensive, but fruitless negotiations took place as revealed in the 4,175 pages of the record. They covered a wide variety of subjects, including the area to be occupied and the rental to be paid during phases of renovations. As the district court found, however, no meeting of the minds occurred. Nevertheless, and apparently to comply with its understanding of the lease requirement, GSA undertook to prepare, under date of December 13, 1978, on the required GSA Standard Form 2, a document entitled "U.S. GOVERNMENT LEASE FOR RENTAL PROPERTY". A rider attached thereto specified certain square foot rental rates.
 
 
 86
 The proposed lease was to be subject to "All terms, conditions and obligations set forth in Solicitation for Offers M.NY-76-560 dated June 28, 1977 (Amendments No. 1 dated July 13, 1977 and No. 2 dated July 26, 1977) thereto; the Lessor's offer dated August 15, 1977, as amended by letters dated September 6, 1977, November 1, 10, 15, 17, 18 and 28, 1977, December 8, 1977, January 31, 1978, and February 1, 1978; the Government's acceptance letter dated October 30, 1978; the Rider attached to the Lease". (A.851).
 
 
 87
 The presentation by GSA for the first time of the required lease brought immediate response from Bedford. On December 15, 1978, Bedford replied: "The lease as prepared by the General Services Administration is completely unacceptable to ownership. The provisions contained in the lease do not reflect, nor are they consistent with the solicitation and award". Exh. 40.
 
 
 88
 That a written lease was contemplated rather than a correspondence-formed agreement is evident from the requirement that "The successful offeror will be required to execute a U.S. Government lease for real property, as prescribed in the code of Federal regulations, 41 C.F.R. 1-16.6". (A. 856). The instructions specified that there be added "(p)rior to execution of the lease additional appropriate paragraphs ... including all schedules and attachments as well as other provisions agreed upon". The offer of August 15, 1977 could not possibly have embodied the terms discussed or agreed upon in the negotiations, the terms of which were constantly changing. Furthermore, the negotiations contemplated had not even taken place at that time. The disparity in the rental figures in the letter of October 30, 1978 and the proposed lease is further indicative of a lack of any meeting of the minds on this essential element. Therefore, the majority's assumption that the letter of October 30, 1978 was sufficient to create a valid and enforceable lease is contrary, in my opinion, to the facts and time-honored principles of contract law.
 
 
 89
 The remand, in effect, calls upon the district court to write a lease for the parties. It says: "On remand, the district court must adjudicate the government's claim for damages under the lease". Since the trial court has held that there is no valid lease it will have to create one despite its holding that there has been no meeting of the minds. This is made obvious by the direction that the court "should give content to the terms of the lease concerning the area to be demised and the rate for overtime services". At ----. Since the district court has already held that there has been no meeting of the minds on these two items, it will have to substitute its "mind" for that of the parties and direct them as to how their minds should function.[1]
 
 
 90
 As to occupancy: IRS has maintained its New York headquarters in the building for almost twenty years. Despite the majority's recognition that the government should not be disturbed in possession, the majority, in effect, tells the government "to make its election either to vacate the premises or to condemn some interest in them". At ----. The opinion does give recognition to the retention of possession by the government "provided that it pays just compensation, as determined by the district court having jurisdiction of the action to the property owner". At ----. The district court has taken testimony as to fair compensation and has fixed a price. I would also affirm its conclusions as to the Bowery mortgage.
 
 
 91
 As I foresee the future with Cassandra-like foreboding, a lease will have to be written for the parties by federal courts. I believe this possibility can be avoided by adhering to the requirement that there be a meeting of the minds at the outset. I would affirm the district court.
 
 
 
 [1]
 Bedford Associates is a partnership consisting of the defendants Doris K. Carver and Samuel Ades. The building is operated and maintained by the defendant Amcar Management Corp. ("Amcar"). Bedford Associates, Carver, Ades and Amcar will hereinafter be collectively referred to as "Bedford."
 
 
 [2]
 In the first appeal, the government challenged, and we largely affirmed, the terms of a preliminary injunction against certain self-help measures threatened by Bedford. United States v. Bedford Associates, 618 F.2d 904 (2nd Cir. 1980)
 
 
 [3]
 Congressional approval is required for government leases at rentals in excess of $500,000. 40 U.S.C. § 606(a) (1976). See also Part II.A.1. infra
 
 
 [4]
 At the time of the negotiations, GSA required that measurements of floor space in office areas be reduced by 10% if the corridor system serving the area failed to "provide ready access to all rooms required." Bedford believed that the reduction factor was not applicable because the government's renovations called for "open landscaping," an arrangement that would not require fixed corridors. GSA responded by advancing the concept of "phantom corridors," i. e., common walkways used to move about the office. GSA later abandoned the 10% reduction factor
 
 
 [5]
 The standard level user's charge is the rate GSA charges the agency that actually occupies the leased premises
 
 
 [6]
 We would charge Bedford with knowledge of these federal laws even if it were not in fact aware of them
 
 
 [7]
 This court undoubtedly has power to apply federal law in disputes between the United States and its lessors. As the Supreme Court has stated, "(F) ederal law governs questions involving the rights of the United States arising under nationwide federal programs." United States v. Kimbell Foods, Inc., 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). See generally Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Moreover, in the setting of the present case, we have ample power to construct rules of federal common law that may vary from the principles of general contract law. Although federal law frequently incorporates state law when there is little need for uniform national rules, see Kimbell Foods, supra; United States v. Little Lake Misere Land Co., 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), the role of Congress under the Economy Act and the Public Buildings Act convincingly demonstrates the need for a uniform approach to contract formation issues in disputes concerning government leases. Congress cannot adequately evaluate the leases submitted for its approval if their validity and terms are subject to varying rules of local law. Because the application of local law would frustrate the strong federal interests in economy and congressional supervision, we must "fashion special rules (of federal common law) solicitous of those federal interests." Kimbell Foods, supra, 440 U.S. at 728, 99 S.Ct. at 1458 (footnote omitted)
 
 
 [8]
 GSA believed that the building contained about 295,000 net usable square feet of office space under its measuring criteria; Bedford contended that it contained about 312,000. Apparently, the parties agreed that the building contained 35,000 square feet of storage space. The disparity between their estimates, about 17,000 square feet, was roughly 5% of the total area
 
 
 [9]
 The government disputes this estimate, which was based on overtime costs under the old lease, on the grounds that the new lease defined overtime differently, and that no "overtime," as thus defined, would have been used under it. We leave the matter for determination on remand
 
 
 [10]
 The effect of a modification of an outstanding offer seems to be an uncertain point of general contract law. Although one leading commentator states that "(a)ny communicated change in the terms of an offer operates as a revocation of that offer" in its entirety, rather than of the affected terms alone, 1 Corbin on Contracts, supra, § 39 at 164 (footnote omitted), there is relatively little case authority for this principle, and at least one court of appeals has declined to apply it as a rigid rule of general federal contract law. United Steelworkers v. Bell Foundry Co., 626 F.2d 139 (9th Cir. 1980)
 
 
 [11]
 FPR § 1-1.004-1 also undercuts Bedford's argument that GSA could not accept the November 1977 proposal because it had never given notice of termination of negotiations as required under 41 C.F.R. § 1-3.805-1(b) (1979). The latter section does not refer to leases and therefore, under § 1-1.004-1, does not govern the leasing process. Although GSA's leasing manual does call for the use of a notice procedure for terminating leasing negotiations, see GSA, Acquisition of Leasehold Interests in Real Property: A GSA Handbook ch. 3-18 at 24 (various dates), that manual does not have the binding effect of duly promulgated regulations, and in any event it plainly contemplates that negotiations may continue even after the formal termination date. Although it would have been helpful if GSA had formally notified Bedford that negotiations would soon end, we see nothing unlawful in its failure to do so
 
 
 [12]
 In holding that the lease was unconscionable, the district court relied upon standards developed under U.C.C. § 2-302, which applies to the sale of goods, and under N.Y. Real Prop. Law § 235-c (McKinney Supp. 1980-1981), which applies to leases. 491 F.Supp. at 864. Although the Court of Claims has applied the doctrine in cases concerning government contracts for the sale of goods, see Fraass Surgical Mfg. Co. v. United States, 571 F.2d 34 (Ct.Cl.1978), it has not explicitly adopted it with respect to leases, and there may be some question as to whether the standards applicable to sales should apply to leases in the absence of a statute. Cf. Berger, Hard Leases Make Bad Law, 74 Colum.L.Rev. 791, 806-13 (1974). Nonetheless, given the generally favorable judicial reception of the doctrine, we feel warranted in assuming that it applies to government leases and that the appropriate standard is that developed under U.C.C. § 2-302
 
 
 [13]
 Although the district court found that the reduction of the notice period for the first renewal option did not affect the notice period for the second, this finding does not alter our analysis. The court also found that GSA believed to the contrary. There was evident room for disagreement on this point, and we cannot say that the government overstepped proper boundaries in dealing with Bedford by threatening to exercise what it thought was a present legal right. Laemmar v. J. Walter Thompson Co., 435 F.2d 680 (7th Cir. 1970), which characterized as duress an employer's threat to discharge its employees unless they sold certain stockholdings to the company, does not suggest a contrary result. Bedford was not a hapless worker threatened with loss of his job. It was a substantial commercial entity, well able to defend its interests in court, as this litigation amply shows. As the district court found, Bedford granted the reduction of the notice period, thereby effectively acceding to the government's view of things, in order to avoid troublesome litigation. That was a rational business decision. It was not made under duress
 
 
 [14]
 At oral argument, the government appeared to concede that it would not be necessary to remand for the exercise of the district court's discretion on the matter of remedy
 
 
 [15]
 The district court held that it had pendent jurisdiction of Bowery's action against Bedford. That ruling is not challenged here
 
 
 [16]
 Congress intended that state law govern many issues in actions under § 2409a. See Letter from Attorney General to Speaker of the House, accompanying H.R. Rep. No. 92-1559, 92d Cong., 2d Sess. 10 (1972), reprinted in (1972) U.S.Code Cong. & Ad.News 4547, 4554, 4555. Cf. United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)
 
 
 [17]
 Section 2410 sets out special pleading rules for suits in which the government's interest is that of tax lienor, regulates the conduct of judicial sales affecting the government's security interests, and specifies procedures for certain redemptions by the United States and for discharge of its junior liens
 
 
 [18]
 Our holding above that Bedford must be bound by the offer it permitted Congress to approve does not alter the analysis as to Bowery. Bowery's belief that the status of the offer was otherwise effectively negatives the knowledge and intent elements of the government's estoppel defense and the bad faith element of the unclean hands defense
 
 
 [1]
 The drafting of a lease is further complicated for the trial court by the majority's statement that "We think that Bedford must be held to the terms of its November 1977 proposal, and that the agreement was therefore definite". At ----